[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-14053
Non-Argument Calendar
_____

D.C. Docket No. 1:12-cv-20863-JAL

JONATHAN CORBETT,

Plaintiff-Appellant,

versus

TRANSPORTATION SECURITY ADMINISTRATION,
UNITED STATES OF AMERICA,
ALEJANDRO CHAMIZO,
BROWARD COUNTY,
BROWARD SHERIFF'S OFFICE,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(June 4, 2014)

Before HULL, WILSON and ANDERSON, Circuit Judges.

PER CURIAM:

Plaintiff-appellant Jonathan Corbett filed a pro se complaint asserting claims against defendants-appellees: (1) the Transportation Security Administration (the "TSA"); (2) the United States; (3) a TSA employee, Alejandro Chamizo; (4) Broward County, Florida; and (5) the Broward County Sheriff's Office (the "Sheriff's Office"). The district court dismissed nineteen of Corbett's claims and subsequently granted the defendants summary judgment on the remaining two claims. Corbett, pro se, appeals the district court's dismissal and summary judgment orders. After careful review of the briefs and the record, we affirm.

## I.  2011 AIRPORT SCREENING

This case involves the TSA's airport security screening of Corbett.

### A.    The Screening of Corbett

On August 27, 2011, Corbett went to the Fort Lauderdale-Hollywood International Airport (the "airport") operated by defendant Broward County. Before boarding commercial flights at U.S. airports, all passengers must submit to screening of their persons and luggage at a security checkpoint. See 49 U.S.C. § 44901.

To board his commercial flight, Corbett proceeded to a security checkpoint operated by defendant TSA. Corbett had two pieces of carry-on baggage—"an

average-sized backpack" and "a small plastic bag of books."[1]  Corbett placed his carry-on bags on the x-ray conveyor belt for screening.  Corbett was asked to go through the full-body scanner, and he declined.

A TSA employee (a "screener") then informed Corbett that he would instead be screened through the use of a manual "pat-down."  The TSA screener explained how the pat-down worked.  The screener would run the back of his hand along Corbett's buttocks.  The screener would place one hand on Corbett's inner-thigh, the other hand on Corbett's hip, and slide the hand on the inner-thigh up until meeting resistance.

Corbett refused to permit the TSA screener to conduct the standard pat-down and further stated the TSA screener could "not touch his genitals or buttocks" during the pat-down.  The TSA screener told Corbett that his refusal to consent to the standard pat-down screening was "a problem" and summoned a supervisor.

To the supervisor, Corbett reiterated his demand that he not be touched on his buttocks or genitals, and the supervisor called the non-uniformed TSA manager, defendant Alejandro Chamizo, who came to the security checkpoint. Corbett alleged that defendant Chamizo warned Corbett "that if he did not consent [to having his genitals and buttocks touched], he would be forcibly searched" and "would be arrested."

---

[1]Corbett had not checked any luggage at the ticket counter.

**B.    The Screening of Corbett's Carry-on Bags**

As Corbett was speaking with the TSA supervisor and defendant Chamizo, TSA screeners manually screened the two carry-on bags that Corbett had placed on the x-ray conveyor belt.  The screeners did so pursuant to TSA Management Directive 100.4, which authorizes screening of "all contents of accessible property, including, but not limited to, containers, compartments, and envelopes" and notes that screening "may be conducted for the purpose of finding threat items or identification media, as appropriate."  The TSA screeners removed two items from the bags and examined them more closely.  The two items were: (1) "a small stack of credit cards, IDs, and other plastic cards"; and (2) a book.

The screener examined the credit and identification cards because TSA Management Directive 100.4 notes that, once screening at a security checkpoint begins, a TSA screener "may screen an individual's accessible property for identification media" to "re-verify that the individual's identity has been matched against government watch lists."  In a sworn declaration, the TSA official who oversaw screening at the airport noted that "where identification media are found in a passenger's carry-on baggage, they are inspected to ensure that the passenger does not use a different name than the name that was submitted for vetting . . . .  A passenger with identification media in more than one name may be attempting to circumvent the . . . watch-list matching program."

4

Corbett "verbally objected to the screener's review of his credit cards," and the TSA screener informed Corbett that he "was just making sure the names matched," as required by the TSA Management Directive.

Corbett also complained that the TSA screener "began to look through the pages of" one of Corbett's books. The TSA security director stated that inspection of a book's pages is necessary because "books may be used to conceal prohibited or other potentially dangerous items." Corbett verbally objected to the review of his book, and the TSA screener told him that the screening of the book was permissible.

In his complaint, Corbett did not allege that defendant Chamizo: (1) personally participated in the inspections of Corbett's carry-on bags or the items therein; or (2) gave any verbal instructions to the screeners on how to conduct their inspections of Corbett's bags. Rather, Corbett's only allegation linking Chamizo to the screening of Corbett's bags and items therein was the following: "CHAMIZO was the 'officer'-in-charge on the scene and approved of the searches."

## C.    The Sheriff's Background Check of Corbett

During these events, a TSA manager summoned an officer from the defendant Sheriff's Office. The manager did so pursuant to the TSA's standard operating procedures, which provide that "if the screening of a passenger or his or

5

her property cannot be completed, law enforcement must be summoned to resolve the issue."

After the Sheriff's officer arrived, defendant Chamizo gave the officer a copy of Corbett's driver's license.[2]  Chamizo gave the driver's license copy to the officer because "TSA screening procedures require that law enforcement personnel be notified when a passenger declines to complete screening, and that certain checks be run using the passenger's information."  Accordingly, the Sheriff's officer conducted a check for outstanding warrants and other background information.  The check of Corbett's background "came back clear."  Corbett alleged that the entire checkpoint process lasted approximately an hour from start to finish.

Because Corbett would not consent to the manual pat-down to complete the screening, Corbett was denied access to his gate and the Sheriff's officer escorted Corbett out of the security checkpoint area.  The TSA security director noted in a sworn declaration that a pat-down is "the last available form of screening" and an individual who refuses to consent to a pat-down, like Corbett, "cannot be cleared" to proceed to his gate.

Corbett took his two carry-on bags and driver's license, and does not allege that the TSA employees withheld any items.

---

[2]At some point, Corbett's driver's license and boarding pass were copied.

6

As discussed later, Corbett claimed that these acts violated his federal and state rights: (1) the detention of Corbett for approximately an hour while the TSA employees attempted to conduct a pat-down screening, screened his two carry-on bags, called a law enforcement officer, and awaited the results of a background check; (2) the inspection of his carry-on bags and two items therein; and (3) the copying of Corbett's driver's license and boarding pass, and the transfer of the driver's license copy to the Sheriff's officer.

## II.  CORBETT'S RECORD REQUESTS

### A.    Corbett's FOIA Request

In September 2011, Corbett sent to the TSA a request for documents and videos of the August 27, 2011 airport screening, under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.

Corbett requested these documents: (1) "[a]ny notes taken by any employees of [the TSA] relating to [the 2011 airport] incident"; (2) "[a]ny incident reports, e-mails, or other documentation created as a result of this incident"; (3) "[a]ny correspondence between [the TSA] and any other party as a result of this incident"; and (4) "[a]ny audio, video, and[/]or photographic records taken on August 27th between 3:45 AM and 5:15 AM at or around the TSA checkpoint in front of the . . . 'E gates' (US Airways)."  Corbett specified:  "[t]his must include all camera views

7

that contain any part of this checkpoint, as well as the camera that monitors the sterile area's exit (adjacent to the checkpoint)."

The TSA referred Corbett's FOIA request to airport officials who "performed a manual search for records." The TSA produced 29 pages of documents, including: (1) incident reports; (2) statements from TSA employees participating in or witnessing the screening; (3) a copy of Corbett's boarding pass; (4) handwritten notes; and (5) a TSA inspector's statement.

The TSA also sent Corbett videos of the screening, but, before doing so, obscured the faces of the TSA employees, the Sheriff's officer, and other passengers in the airport security checkpoint area. The TSA also redacted the printed names of TSA employees and the Sheriff's officer. The TSA made these redactions pursuant to FOIA Exemption 6, 5 U.S.C. § 552(b)(6), and, as to the name of the Sheriff's officer, also pursuant to Exemption 7(C), id. § 552(b)(7)(C).[3]

Corbett filed an administrative appeal challenging all redactions. The TSA denied Corbett's appeal.[4]

---

[3]The TSA also redacted material regarding TSA operations considered by the TSA to be "sensitive security information" and exempted under FOIA Exemption 3. 5 U.S.C. 552(b)(3). In this appeal, Corbett does not challenge these redactions.

[4]Corbett also requested records from defendants Broward County and the Sheriff's Office under the Florida Public Records Act, Fla. Stat. § 119.07. In the district court, Corbett challenged the adequacy of defendant Broward County's response to his Public Records Act request, and the district court rejected that claim. Corbett's opening brief on appeal does not challenge the district court's ruling, and therefore Corbett abandons the issue on appeal. See Timson v. Sampson, 518 F.3d 870, 874 (11th Cir. 2008).

### III.  PROCEDURAL HISTORY

**A.     Corbett's Amended Complaint**

In March 2012, plaintiff Corbett filed a pro se complaint against defendants

the TSA, the United States, Chamizo, and Broward County.  In May 2012, Corbett

filed an amended complaint (the "amended complaint"), adding the Sheriff's

Office as a defendant.

Corbett's amended complaint asserted twenty-one claims, including, inter

alia: (1) claims against TSA manager Chamizo, in his individual capacity, under

Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388,

91 S. Ct. 1999 (1971), alleging that Chamizo violated Corbett's Fourth

Amendment rights; (2) tort claims against the United States, based on its waiver of

sovereign immunity in the Federal Tort Claims Act ("FTCA"), 28 U.S.C.

§ 1346(b); (3) claims against the TSA under the Privacy Act, 5 U.S.C. § 552a; and

(4) a claim against the TSA for unredacted records under FOIA.

**B.     Rule 12(b) Dismissal and Summary Judgment**

Each of the defendants filed a motion to dismiss pursuant to Rule 12(b) of

the Federal Rules of Civil Procedure.  See Fed. R. Civ. P. 12(b).  On November 16,

2012, the district court granted the motions as to all claims other than the claims for unredacted records under FOIA.[5]

After discovery on the FOIA claim, the TSA filed a motion for summary judgment. The district court granted the motion in favor of the TSA, thus disposing of all of Corbett's claims.

Corbett timely filed a notice of appeal. We construe Corbett's pro se notice of appeal as covering the district court's orders on the motions to dismiss and the summary judgment motion.

## IV.  THE BIVENS CLAIMS AGAINST DEFENDANT CHAMIZO

We first address the Rule 12(b)(6) dismissal of Corbett's Bivens claims against defendant Chamizo based on the 2011 airport screening.[6]

### A.    Qualified Immunity Principles

"Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person

---

[5]On December 18, 2012, the district court denied Corbett's motion to file a second amended complaint. In this appeal, Corbett has not shown that the district court abused its discretion in denying this motion. See Lowe's Home Ctrs., Inc. v. Olin Corp., 313 F.3d 1307, 1314–15 (11th Cir. 2002) ("[A] district court has great discretion when deciding whether to grant a motion for leave to amend a complaint following the filing of responsive pleadings.").

[6]We review de novo the district court's grant of a motion to dismiss under Rule 12(b)(6) for failure to state a claim, "accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff." Leib v. Hillsborough Cnty. Pub. Transp. Comm'n, 558 F.3d 1301, 1305 (11th Cir. 2009).

would have known." Andujar v. Rodriguez, 486 F.3d 1199, 1202 (11th Cir. 2007) (quotation marks omitted).

Here, undisputedly, defendant Chamizo was engaged in discretionary functions during the 2011 airport screening. Therefore, we examine: (1) whether the facts alleged, accepted as true and viewed in the light most favorable to Corbett, show that Chamizo's conduct violated one of Corbett's federal constitutional rights; and if so, (2) whether that right was "clearly established" at the time of the 2011 airport screening. See Scott v. Harris, 550 U.S. 372, 377, 127 S. Ct. 1769, 1774 (2007) (quotation marks omitted).

To analyze these questions, we review the law regarding airport screening.

## B.    Screening at Airport Security Checkpoints

The Fourth Amendment protects individuals "against unreasonable searches and seizures," U.S. Const. amend. IV, and a search conducted without a warrant is "per se unreasonable subject only to a few specifically established and well-delineated exceptions," United States v. Garcia, 890 F.2d 355, 360 (11th Cir. 1989) (quotation marks and alteration omitted). One exception to the warrant requirement is for suspicionless searches conducted pursuant to administrative programs, such as security screenings of airport passengers.

Congress explicitly requires "the screening of all passengers and property . . . that will be carried aboard a passenger aircraft." 49 U.S.C. § 44901(a). The

11

Supreme Court has instructed that the suspicionless screenings conducted at airport security checkpoints pursuant to this statute fall under the administrative search exception to the Fourth Amendment's warrant requirement.  See Chandler v. Miller, 520 U.S. 305, 323, 117 S. Ct. 1295, 1305 (1997) ("[W]here the risk to public safety is substantial and real, blanket suspicionless searches calibrated to the risk may rank as 'reasonable'—for example, searches now routine at airports . . . ."); see also Nat'l Treasury Emps. Union v. Von Raab, 489 U.S. 656, 674–75 & n.3, 109 S. Ct. 1384, 1395 & n.3 (1989) (providing as an example of a suspicionless search that may qualify as reasonable "the Federal Government's practice of requiring the search of all passengers seeking to board commercial airliners, as well as the search of their carry-on luggage, without any basis for suspecting any particular passenger of an untoward motive").

In short, airport security screenings are generally "permissible administrative search[es] under the Fourth Amendment, even though [they are] initiated without individualized suspicion and [are] conducted without a warrant."  See George v. Rehiel, 738 F.3d 562, 577 (3d Cir. 2013).  "[S]creening passengers at an airport is an 'administrative search' because the primary goal is not to determine whether any passenger has committed a crime but rather to protect the public from a terrorist attack."  Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec., 653 F.3d 1, 10 (D.C. Cir. 2011).  "[T]hose presenting themselves at a[n] [airport] security

12

checkpoint thereby consent to a search, and may not revoke that consent if the authorities elect to conduct a search." United States v. Herzbrun, 723 F.2d 773, 776 (11th Cir. 1984).

With these legal principles in mind, we turn to Corbett's claims against defendant Chamizo.

## C.    The Screening of Corbett's Bags, Cards, and Book

It is well established in this Circuit that supervisory officials, such as defendant Chamizo, are "not liable under Bivens for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." Gonzalez v. Reno, 325 F.3d 1228, 1234 (11th Cir. 2003) (quotation marks and alteration omitted). Thus, to state a Bivens claim based on supervisory liability against defendant Chamizo, Corbett must allege that supervisor Chamizo "personally participated in the alleged unconstitutional conduct or that there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation." Franklin v. Curry, 738 F.3d 1246, 1249 (11th Cir. 2013) (quotation marks omitted).

Corbett, however, did not allege that defendant Chamizo personally opened any bags, inspected the bags' contents, or verbally directed the TSA employees to do any specific conduct. Corbett alleged only that Chamizo "was the 'officer'-in-charge on the scene and approved of the searches." Such "vague and conclusory

13

allegations" do not establish a causal connection between a supervisor and unlawful activity.  See Gonzalez, 325 F.3d at 1235.

Alternatively, even if this allegation was arguably sufficient, the search of Corbett's bags and contents did not violate the Fourth Amendment.  Here, the TSA screeners were authorized, and indeed required, to inspect Corbett's carry-on bags and the items contained therein.  See 49 U.S.C. § 44901.  Further, by the time the TSA employees inspected Corbett's bags, Corbett had refused to allow the TSA employees to fully screen his person—either through use of a full-body scanner or the standard pat-down procedure.  A reasonable TSA employee, at that point, could have suspected that Corbett's refusals resulted from his desire to conceal unlawful activity.  See Herzbrun, 723 F.2d at 777 (stating that, "in deciding the lawfulness of a[n] [airport security] search, a court should focus on the reasonableness of the investigating officer's actions . . . .  on the basis of the articulable facts at hand" to determine whether the officer "had reason to suspect that the defendant was carrying materials that could endanger the safety of a flight").  Thus, a thorough screening of Corbett's bags was reasonable, even beyond the point of determining whether those belongings contained weapons.

As the TSA security director pointed out, when TSA screeners find identification cards in a passenger's carry-on luggage, they must inspect those cards "to ensure that the passenger does not use a different name than the name

14

that was submitted for vetting."  A passenger's use of multiple names could indicate that the passenger is trying to circumvent the TSA's security measures.

We recognize that Corbett's amended complaint alleged that a TSA screener looked through the pages of one of Corbett's books "in a manner that was not to determine if [weapons, explosives, or other incendiary devices] were somehow hidden within the book, but rather to inspect the text of the book."  It was not unreasonable for a TSA screener to closely inspect Corbett's book, though, because "thin, flat explosives called 'sheet explosives' may be disguised as a simple piece of paper or cardboard, and may be hidden in just about anything, including a laptop, book, magazine, deck of cards, or packet of photographs." United States v. McCarty, 648 F.3d 820, 825 (9th Cir. 2011).  Furthermore, a TSA screener could have reasonably factored the contents of a book possessed by a passenger into the totality of the circumstances relevant in determining whether the passenger presented a security threat.  See George, 738 F.3d at 585–86 (noting that the facts that an individual carried a book critical of American foreign policy in the Middle East and Arabic flashcards were circumstances which "raised the possibility that [the individual] might pose a threat to airline security").

For all of these reasons, Corbett's allegations about the search of his bags and the items therein failed to state a Fourth Amendment claim against defendant Chamizo individually.

**D.    Detention of Corbett**

We also affirm the dismissal of Corbett's detention claim against defendant Chamizo.  Corbett consented to a screening of his person by presenting himself at the security checkpoint.  Corbett could not revoke this consent by merely leaving the checkpoint.  See Herzbrun, 723 F.2d at 776 (observing that a rule allowing an individual to revoke his consent to an airport security screening by leaving the airport security checkpoint "constitute a one-way street for the benefit of a party planning airport mischief, since there is no guarantee that if he were allowed to leave he might not return and be more successful" (quotation marks omitted)).

We recognize that the entire security checkpoint screening lasted approximately one hour.  Yet, accepting the alleged facts as true, Corbett was primarily to blame for that screening lasting as long as it did.  If Corbett had permitted the TSA screeners to conduct a full pat-down screening, he would have swiftly proceeded to his gate.  Although a seizure may become "unlawful if it is prolonged beyond the time reasonably required to complete [its lawful] mission," see Illinois v. Caballes, 543 U.S. 405, 407, 125 S. Ct. 834, 837 (2005), we cannot say that the time here, given all the factual circumstances, was unreasonable for the TSA employees to satisfy themselves that Corbett did not pose a security threat.

**V.  THE TORT CLAIMS AGAINST THE UNITED STATES**

16

We turn to Corbett's tort claims for assault, false arrest, invasion of privacy, and intentional infliction of emotional distress ("emotional distress"), against the United States.  The district court dismissed these claims under Rule 12(b)(1) as barred by sovereign immunity, but Corbett contends the FTCA's limited waiver of sovereign immunity applies to these claims.[7]

## A.      The FTCA's Limited Waiver of Sovereign Immunity

Sovereign immunity protects the federal government and its agencies from civil liability.  Fed. Deposit Ins. Corp. v. Meyer, 510 U.S. 471, 475, 114 S. Ct. 996, 1000 (1994).  The FTCA in 28 U.S.C. § 1346(b) provides a limited waiver of sovereign immunity for tort claims.  Motta ex rel. A.M. v. United States, 717 F.3d 840, 843 (11th Cir. 2013).  That statute confers on federal district courts exclusive jurisdiction to hear claims against the United States for money damages "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment."  28 U.S.C. § 1346(b)(1) (emphasis added).[8]

---

[7]We review de novo a district court's dismissal of a claim for lack of subject matter jurisdiction.  Digital Props., Inc. v. City of Plantation, 121 F.3d 586, 589 (11th Cir. 1997). Absent a waiver of sovereign immunity, a district court lacks subject matter jurisdiction to hear claims against the United States.  Bennett v. United States, 102 F.3d 486, 488 n.1 (11th Cir. 1996).

[8]The statute further provides that the United States is liable only if, under like circumstances, a private person "would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b)(1).

The first problem for Corbett is that this limited waiver of sovereign immunity in § 1346(b)(1) does not apply to claims based on intentional torts of federal employees.  28 U.S.C. § 2680(h).  Specifically, § 2680(h), also an FTCA provision, states that the United States does not waive sovereign immunity as to "[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights."  Id. § 2680(h).  This part of the FTCA is known as the "intentional torts exception" to the waiver in § 1346(b)(1).

Importantly, this intentional torts exception in § 2680(h) is "not limited to the torts specifically named therein, but rather encompasses situations where the underlying governmental conduct which constitutes an excepted cause of action is essential to the plaintiff's claim."  O'Ferrell v. United States, 253 F.3d 1257, 1266 (11th Cir. 2001) (quotation marks omitted).

Two of Corbett's intentional tort claims—assault and false arrest—are specifically named in § 2680(h), and thus sovereign immunity is not waived as to those claims.  His other intentional tort claims—invasion of privacy and emotional distress—are based on the same underlying governmental conduct as Corbett's excepted claims for assault and false arrest.  For example, the amended complaint alleged that the TSA screeners invaded Corbett's privacy by "surround[ing] CORBETT with uniforms," "dump[ing] CORBETT's belongings out on a table,"

18

and examining those items.  Similarly, Corbett's amended complaint stated that the TSA screeners detained him at the airport security checkpoint and subjected him to "unlawful seizure," which caused him to experience "serious emotional distress."

Because Corbett's invasion of privacy and emotional distress claims are based on the same underlying conduct as his assault and false arrest claims, they are likewise subject to the intentional torts exception to the sovereign immunity waiver.  See id. at 1265 (noting that claims of intentional infliction of emotional distress and intrusion upon privacy were barred when they were "derivative from plaintiff's underlying contention that he had been the victim of a false arrest" and "'false arrest' is one of the tort claims barred by 28 U.S.C. § 2680(h)").

## B.    The Law Enforcement Officer Proviso

We do not stop there, though, because there is also a statutory exception— termed the "law enforcement proviso"—to the statutory intentional torts exception to the sovereign immunity waiver.  Immediately after stating that sovereign immunity is not waived with regard to certain intentional tort claims, § 2680(h) states: "Provided, That, with regard to acts or omissions of investigative or law enforcement officers of the United States Government, the provisions of this chapter and section 1346(b) of this title shall apply to any claim arising . . . out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution."  28 U.S.C. § 2680(h) (second emphasis added).

19

Thus, the sovereign immunity waiver applies to the intentional tort claims here if the TSA employees involved were "investigative or law enforcement officers of the United States Government." Id. Section 2680(h) defines "investigative or law enforcement officer" to mean "any <u>officer of the United States</u> who is empowered by law to <u>execute searches</u>, to seize evidence, or to make arrests for violations of Federal law." Id. (emphases added).

Several courts have concluded that TSA screeners perform consensual, pre-boarding administrative searches for certain prohibited items (i.e., knives, firearms, liquids, gels, etc.), not traditional law enforcement functions such as making arrests and executing searches for violations of federal law, although their reasoning has varied. See <u>Pellegrino v. U.S. Transp. Sec. Admin.</u>, No. 09-5505, 2014 WL 1489939, at *5–8 (E.D. Pa. Apr. 16, 2014) (concluding that the phrase "searches . . . for violations of Federal law" is ambiguous and determining that an analysis of the FTCA's legislative history "strongly suggests that the law enforcement proviso was enacted as a response to specific egregious behavior during raids conducted by federal law enforcement officers, and was not intended to be expansive enough to cover airport security screeners" (omission in original)); <u>Walcott v. United States</u>, No. 13-CV-3303, 2013 WL 5708044, at *3 (E.D.N.Y. Oct. 18, 2013) (concluding that "the meaning of 'empowered by law to execute searches . . . for violations of Federal law' under § 2680(h) is narrower than the meaning of a 'search' under the

Fourth Amendment—that is, just because something is an administrative search under the Fourth Amendment, it doesn't mean the person doing the search is a law enforcement officer under § 2680(h)" (omission added)); Weinraub v. United States, 927 F. Supp. 2d 258, 263 (E.D.N.C. 2012) (observing that TSA screeners' power "is limited to pre-boarding searches for certain prohibited items," and concluding that "it would be unreasonable to interpret 'to execute searches' to include the TSA screener's performance of narrowly focused, consensual searches that are administrative in nature, when considered in light of the other traditional law enforcement functions (i.e., seizure of evidence and arrest) that Congress chose to define 'investigative or law enforcement officers'"); Coulter v. U.S. Dep't of Homeland Sec., No. 07-4894 (JAG), 2008 WL 4416454, at *7–9 (D.N.J. Sept. 24, 2008) (TSA screeners are not law enforcement officers because, inter alia, the statute authorizing airport security screening "does not include language referencing the power of an airport security screener to perform searches").[9]

_____

[9]See also Hernandez v. United States, No. 12-cv-03165-LTB, 2014 WL 803774, at *6–7 (D. Colo. Feb. 28, 2014) (TSA screeners are not law enforcement officers because the functions named in the law enforcement proviso are "commonly understood to be traditional law enforcement functions . . . commonly performed by FBI agents, Bureau of Prison Officers, postal inspectors, and INS agents, all of which have broad investigative and law enforcement powers, and . . . fall within the law enforcement proviso," whereas TSA screeners only screen passengers for items "which are prohibited on airplanes, but not illegal to possess"); Welch v. Huntleigh USA Corp., No. 04-663 KI, 2005 WL 1864296, at *5 (D. Or. Aug. 4, 2005) (independent contractors performing screening for TSA were not law enforcement officers because "[s]creeners do not have the authority to detain individuals and must call law enforcement officers to search, seize, and arrest individuals if illegal items are found").

We need not resolve this thorny "search" issue.  The TSA screeners are not subject to the law enforcement proviso for a simpler reason—they are not "officers of the United States Government," as required by § 2680(h)'s statutory language. The FTCA draws a distinction between a "federal employee" and an "officer of the United States."  Specifically, the FTCA waives the government's sovereign immunity for tort claims based on the acts or omissions of "any <u>employee of the Government</u> while acting within the scope of his office or employment."  28 U.S.C. § 1346(b)(1) (emphasis added).  Likewise, § 2680, the statute providing exceptions to the FTCA's sovereign immunity waiver, refers to "an act or omission of an <u>employee of the Government</u>."  <u>Id.</u> § 2680(a) (emphasis added).  The law enforcement proviso in § 2680(h), however, uses the term "officer of the United States," rather than "employee," as is used elsewhere in the FTCA.  <u>Id.</u> § 2680(h). This variation in language is not insignificant and shows that the law enforcement proviso applies only when the person, whose conduct is at issue, is an "officer of the United States."

Further, the federal statutes governing airport security screening differentiate between federal employees of TSA and law enforcement officers.  Significantly, 49 U.S.C. § 44901 states that "screening . . . shall be carried out by a Federal Government employee."  49 U.S.C. § 44901(a). Congress, however, explicitly authorized the TSA Administrator to "designate an employee of the [TSA] or other

22

Federal agency to serve as a law enforcement officer." Id. § 114(p)(1). Only after being so designated may the TSA employee: (1) "carry a firearm"; (2) "make an arrest . . . for any offense against the United States"; or (3) "seek and execute warrants for arrest or seizure of evidence." Id. § 114(p)(2)(A)–(C). The TSA Administrator thus must affirmatively act to make a TSA employee an "officer." Merely being a TSA employee does not make one an "officer of the United States Government."

These provisions show that, within TSA, there are: (1) federal employees, who conduct airport security screening; and (2) law enforcement officers, who perform various law enforcement functions. The TSA screeners here are the first type—federal employees conducting airport security screening. Nothing in the record in this particular case shows that the TSA employees who screened Corbett had been specially designated as officers under § 114(p). In fact, in Corbett's discussion of the separate FOIA issue in this appeal, Corbett's brief actually admits that "the TSA is not a law enforcement agency." Because the TSA screeners here are federal employees, the law enforcement proviso regarding "officers of the United States" is inapplicable.

Therefore, the intentional torts exception does apply, and sovereign immunity bars Corbett's intentional tort claims against the United States, which

23

included claims for assault, false arrest, invasion of privacy, and emotional distress. We affirm the district court's dismissal of those tort claims.

## VI.  THE PRIVACY ACT CLAIMS AGAINST THE TSA

The district court also did not err in dismissing Corbett's Privacy Act claims. The TSA is subject to the Privacy Act's requirements for federal agency recordkeeping. See 5 U.S.C. § 552a(e)(1)–(12). The basis for Corbett's claims is that TSA's Chamizo, at the security checkpoint, photocopied Corbett's driver's license and boarding pass without first complying with the Privacy Act's requirements.

To prevail on a Privacy Act claim under § 552a(g)(4), an individual must show, inter alia, that he suffered actual damages. Speaker v. U.S. Dep't of Health & Human Servs., 623 F.3d 1371, 1381 (11th Cir. 2010). The Privacy Act does not allow for recovery of non-pecuniary damages stemming from "loss of reputation, shame, mortification, injury to the feelings and the like." Fed. Aviation Admin. v. Cooper, 566 U.S. ___, 132 S. Ct. 1441, 1449, 1451 (2012) (quotation marks omitted) (construing § 552a(g)(4)). We need not evaluate whether Corbett stated a Privacy Act violation because he alleged no pecuniary loss or actual damages as a result of a Privacy Act violation.

Alternatively, Corbett contends that the district court should have liberally construed his Privacy Act claims as requests for an injunction ordering the TSA "to

24

amend" its records by destroying the copies of Corbett's driver's license and boarding pass. The Privacy Act does provide for injunctive relief in the form of ordering an agency to: (1) "amend the individual's record in accordance with his request or in such other way as the court may direct"; or (2) produce to the individual "any agency records improperly withheld from him." 5 U.S.C. § 552a(g)(2)–(3). Corbett's injunction claim, however, fails because an individual must file with an agency a formal request for an amendment or disclosure of records before seeking an injunction. See id. § 552a(d)(1), (d)(2). Corbett did not allege that he made such a request. Thus, he is not entitled to injunctive relief.

## VII.  THE FOIA CLAIM AGAINST TSA

The next issue is whether the district court properly granted the TSA's motion for summary judgment on Corbett's FOIA claim.[10]

### A.    FOIA Principles

Under FOIA, a government agency must disclose to the public requested documents unless they fall within one of the nine statutory exemptions. Moye, O'Brien, O'Rourke, Hogan, & Pickert v. Nat'l R.R. Passenger Corp., 376 F.3d 1270, 1276 (11th Cir. 2004); see 5 U.S.C. § 552(a). An agency may redact portions of material from requested records. See U.S. Dep't of State v. Ray, 502

---

[10]We review a grant of summary judgment de novo, and the district court's factual findings for clear error. Robinson v. Tyson Foods, Inc., 595 F.3d 1269, 1273 (11th Cir. 2010).

U.S. 164, 173, 112 S. Ct. 541, 547 (1991).  The agency has the burden of showing that a FOIA exemption supports its withholding a document or making redactions. Id.

Here, the TSA produced documents and videos, but redacted: (1) the names of the TSA employees and Sheriff's officer; and (2) the faces of all individuals in the videos.  The TSA relied on Exemption 6.

## B.    FOIA Exemption 6

Exemption 6 provides that an agency need not disclose "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  To determine whether Exemption 6 applies, we ask: (1) whether the withheld material was within "personnel, medical, or similar files"; and, if so, (2) whether "a balancing of individual privacy interests against the public interest in disclosure reveals that disclosure of the information would constitute a clearly unwarranted invasion of personal privacy."  News-Press v. U.S. Dep't of Homeland Sec., 489 F.3d 1173, 1196–97 (11th Cir. 2007) (quotation marks omitted).

FOIA does not provide a definition of the term "similar files."  In U.S. Department of State v. Washington Post Co., 456 U.S. 595, 102 S. Ct. 1957 (1982), the Supreme Court instructed that "the phrase 'similar files' was to have a broad, rather than a narrow, meaning."  Id. at 600, 102 S. Ct. at 1961.  Exemption 6

26

is not limited to "a narrow class of files containing only a discrete kind of personal information." Id. at 602, 102 S. Ct. at 1961. Instead, the exemption applies to "detailed Government records on an individual which can be identified as applying to that individual." Id. (quotation marks omitted). Congress's "primary purpose in enacting Exemption 6 was to protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information." Id. at 599, 102 S. Ct. at 1960. In light of this purpose, the Supreme Court determined that Congress intended that "the balancing of private against public interests, not the nature of the files in which the information was contained, should limit the scope of the exemption." Id.

Further, an agency's investigative reports constitute "similar files" for purposes of Exemption 6. See Forest Serv. Emps. for Envtl. Ethics v. U.S. Forest Serv., 524 F.3d 1021, 1023–24 (9th Cir. 2008) (based on the Supreme Court's Washington Post opinion, the court had "little difficulty in concluding that the names and identifying information contained in [an agency report of an investigation into a fatal forest fire] me[t] the 'similar file' requirement of Exemption 6"); Wood v. Fed. Bureau of Investigation, 432 F.3d 78, 86 (2d Cir. 2005) ("Exemption 6 applies to any personal information contained in files similar to personnel or medical files, such as administrative investigative records."); see also Judicial Watch, Inc. v. Food & Drug Admin., 449 F.3d 141, 152–53 (D.C. Cir.

27

2006) (an agency's redactions of names from records of the approval process for a drug was permissible under Exemption 6 because the statute exempts "not just files, but also bits of personal information, such as names and addresses, the release of which would create a palpable threat to privacy" (quotation marks and alterations omitted)).

Our circuit has applied Exemption 6 in several cases. In Federal Labor Relations Authority (F.L.R.A.) v. U.S. Department of Defense, 977 F.2d 545 (11th Cir. 1992), this Court held that the Defense Department's disclosure of a list of names and addresses of non-union federal employees within a relevant bargaining unit would result in an unwarranted invasion of personal privacy and withholding was allowed under Exemption 6. Id. at 547–50. We noted that "employee addresses say nothing about a federal agency's character or function" and therefore "the public interest side of the balance" carried little weight. Id. at 548. We rejected as overly tenuous any suggestion that the public had an interest in being able to contact "federal employees to learn something about the government" when there was no allegation that the government was operating irregularly. Id. On the other hand, we recognized strong privacy interests in one's address, as "an address . . . . is an indicator of one's choice of neighborhoods and one's affluence." Id. at 548–49. Therefore, we held that the privacy interests clearly outweighed the public interests in disclosure. Id. at 549–50.

28

Next, in <u>Office of the Capital Collateral Counsel v. U.S. Department of Justice</u>, 331 F.3d 799 (11th Cir. 2003), this Court concluded that, under Exemption 6, the Department of Justice ("DOJ") could withhold certain documents pertaining to internal disciplinary proceedings against a former Assistant U.S. Attorney ("AUSA"). <u>Id.</u> at 801–02, 804. We noted that "[t]he fact that [the AUSA] was a public official . . . [did] not render her interest in preserving her personal privacy without weight." <u>Id.</u> at 803. The AUSA's privacy interest was significant, as the documents reflected "her private thoughts and feelings concerning her misconduct . . . and its effect on her, her family, and her career." <u>Id.</u> And there was "already substantial information available to the public about [the AUSA's] misconduct and her subsequent sanctions." <u>Id.</u> at 804. This already-public information satisfied the public interest in knowing about how the DOJ responded to the misconduct, and the AUSA's personal reflections about her misconduct were "not relevant to the public interest in knowing what the government is doing." <u>Id.</u>

In <u>News-Press v. U.S. Department of Homeland Security</u>, this Court permitted the Department of Homeland Security ("DHS") to redact from documents the names of individuals who applied for federal disaster relief funds after four hurricanes struck Florida. 489 F.3d at 1177–79, 1205. However, we required the DHS to disclose the applicants' addresses. <u>Id.</u> at 1205. This Court observed that the three news organizations did not articulate a "terribly strong"

29

public interest in disclosure of the names.  Id. at 1185, 1205.    Further,

withholding the names would "substantially reduce the potential for negative

secondary effects of disclosing the addresses."  Id. (quotation marks and alteration

omitted).

## C.    Applying Exemption 6 Here

Under the particular facts here, we conclude Exemption 6 permitted the

limited redactions the TSA made.  The TSA produced its full investigative files,

including incident reports, witness statements, and videos.  The TSA protected

only names in the documents and faces on the videos.

The TSA's documents and videos describe in full detail every aspect of the

events at issue and the TSA's response to those events.  Disclosure of the names of

the individuals in those documents, or faces of the individuals, would not add to a

reader's or viewer's understanding of those documents and images.  See F.L.R.A.,

977 F.2d at 548.  Additionally, the TSA employees named and depicted are low-

level screeners and security-checkpoint supervisors, and disclosure of their

personal identities would not shed any light on the TSA's operations.  See Wood,

432 F.3d at 88–89; see also Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland

Sec., 384 F. Supp. 2d 100, 116–17 (D.D.C. 2005) (concluding Exemption 6

allowed the TSA to redact names of its employees in documents because: (1)

"federal employees have an identifiable privacy interest in avoiding disclosures of

information that could lead to annoyance or harassment"; (2) "the public interest in learning the names of . . . lower-echelon employees is small"; and (3) there was no showing how the employees' names would help the public "understand how the agency performs its statutory duties").

Here, the individuals, named or depicted, have privacy interests in avoiding disclosure of their personal identifying information.  See U.S. Dep't of Defense v. F.L.R.A., 510 U.S. 487, 500, 114 S. Ct. 1006, 1015 (1994).  And, Corbett has not shown the public has a compelling interest in disclosure of these personal identities.  Corbett has not offered a reasonable, much less a compelling, explanation for a public interest, or even his own personal need, for the names and faces in the records here.  For example, Corbett does not contend that knowing the personal identities would assist him in this or other litigation.

In short, based on the record before us, we conclude the individuals' privacy interests outweigh any public interest in disclosure of the names and faces here.

We thus affirm the district court's summary judgment to the TSA on Corbett's FOIA claim.[11]

## VIII.  CONCLUSION

In light of the foregoing, we affirm.

_____

[11]Because Exemption 6 supports all of the TSA's redactions, we need not consider whether Exemption 7(C) provides a separate basis for the redactions of the Sheriff's officer's name.  Additionally, we affirm the district court's dismissal of the civil conspiracy claim, as well as the claim under the Florida Constitution.  We agree with the district court's cogent analysis of these claims.

31

**AFFIRMED.**