FILED
**United States Court of Appeals**
**Tenth Circuit**

**October 29, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

RHONDA MENGERT,

　　Plaintiff - Appellant,

v.

UNITED STATES OF AMERICA,

　　Defendant - Appellee.

No. 23-5100

_____

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 4:21-CV-00443-CVE-SH)**
_____

Jonathan Corbett, Corbett Rights, P.C., Los Angeles, California, for Plaintiff-Appellant
Rhonda Mengert.

Daniel Aguilar, U.S. Department of Justice, Washington, D.C. (Brian M. Boynton,
Principal Deputy Assistant Attorney General, and Sharon Swingle, with him on the
brief), for Defendant-Appellee United States of America.
_____

Before **TYMKOVICH**, **EBEL**, and **ROSSMAN**, Circuit Judges.
_____

**EBEL**, Circuit Judge.
_____

　　This case stems from Transportation Security Officers (TSOs) subjecting plaintiff

Rhonda Mengert to an inspection in a private room at Tulsa International Airport.  After

Mengert's initial security screening and a subsequent pat-down left TSOs unsure as to the

nature of an object in her groin area—which turned out to be an ordinary feminine hygiene product—TSOs led her to a private screening room and directed her to lower her pants and remove the object for examination.  Mengert has alleged that the incident caused her to experience symptoms of a panic attack, and that her symptoms have recurred on a regular basis when she travels by plane.  Mengert brought claims against the United States under the Federal Tort Claims Act (FTCA) alleging intentional infliction of emotional distress (IIED) and false imprisonment.  Relevant here, the district court denied the government's motion to dismiss the complaint under Fed. R. Civ. P. 12(b)(1) for lack of jurisdiction based on sovereign immunity; granted the government's motion to dismiss the IIED claim under Fed. R. Civ. P. 12(b)(6); denied Mengert's untimely motion for leave to amend her complaint; and granted the government's motion for summary judgment on Mengert's false imprisonment claim.  All four of these decisions are challenged on appeal.

We first conclude that the district court properly found that it had jurisdiction over Mengert's claims.  This decision turns on whether TSOs are "investigative or law enforcement officer[s]" as defined by 28 U.S.C. § 2680(h)'s law enforcement proviso, which waives sovereign immunity for enumerated tort claims against the United States [often hereafter referred to as the "government"], including false imprisonment and false arrest claims, challenging the conduct of "law enforcement or investigative officer[s]" employed by the United States.  The law enforcement waiver defines an "investigative or law enforcement officer" as "any officer of the United

2

States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law."  We conclude that TSOs fall under this definition.

We also conclude that Mengert failed to allege sufficiently severe emotional distress in her complaint, as required to maintain an IIED claim under Oklahoma law.  Additionally, Mengert's false imprisonment claim—which the district court properly treated as a false arrest claim because it challenges her detention by a public defendant— fails because Mengert does not challenge the lawfulness of her detention itself, but instead challenges the lawfulness of the TSOs' conduct during the detention.  Thus, under Oklahoma law, Mengert's theory cannot support a false arrest claim.  Finally, the district court did not abuse its discretion in denying Mengert's belated motion for leave to amend the complaint because she has failed to show "good cause" for her delay in filing that motion.

Having jurisdiction under 28 U.S.C. § 1291, we therefore AFFIRM.

## I. BACKGROUND[1]

Plaintiff-Appellant Rhonda Mengert went to Tulsa International Airport on May 12, 2019, for a flight to Las Vegas, Nevada.  Mengert, who held Transportation Security Administration (TSA) PreCheck clearance, presented a valid ID and boarding pass in the TSA line.  She was then directed to the PreCheck screening area.  After Mengert was screened via body scanner, she was informed that she would need additional

---

[1] This section refers to facts from both Mengert's complaint and evidence upon which the district court relied in its summary judgment decision.  We consider only the allegations in the complaint in our consideration below of the district court's dismissal of part of Mengert's complaint under Fed. R. Civ. P. 12(b)(6).

3

screening via pat-down. During the pat-down, Transportation Security Officer Amy Morroney detected an object in Mengert's groin area—the object turned out to be an ordinary feminine hygiene product, but Morroney could not determine the nature of the object at that time. Morroney then conducted a test for explosives trace, and that test was negative.

Morroney then told Mengert that she would need to go to a private screening room to be cleared. Morroney and another TSO, Whitney Brown—both women—led Mengert to the private screening room and closed the door behind them. Morroney gave Mengert a paper privacy drape and told Mengert to lower her shorts and remove the object. Mengert told the TSOs that the object was simply a feminine hygiene product and said something like, "you've got to be kidding me." (Aplt. App. at 230-31). Mengert asked for clarification of what the TSOs were asking of her, and they responded that they needed to "clear the area." (Id.) The TSOs then directed Mengert to lower her pants and underwear and remove the feminine hygiene product for inspection. Mengert followed their direction, lowering her shorts and underwear and removing the feminine hygiene product. She did not attempt to use the privacy drape. Morroney confirmed that the object was a feminine hygiene product and was therefore not prohibited. Mengert then said, "are you satisfied," replaced the pad, and pulled up her shorts. (Id.) The TSOs did not immediately respond to Mengert, and Mengert requested to leave three more times before one of the TSOs opened the door and Mengert left the room. Mengert's entire encounter with the TSOs lasted about seven minutes including three minutes in the private screening room.

4

During the incident, Mengert experienced symptoms of a panic attack. She experiences similar symptoms when reminded of the incident, as well as additional physical symptoms, such as uncontrollable shaking. Mengert has flown on about a monthly basis for both work and other reasons since the incident, which has caused her to be regularly reminded of the incident and experience the above symptoms.

## II. PROCEDURE

In a prior case, Mengert filed a complaint seeking injunctive relief against the TSA and asserting constitutional and tort claims against the TSOs. The district court dismissed the claims against the TSOs, and Mengert voluntarily dismissed her claim for injunctive relief against the TSA.

Mengert filed a new complaint, at issue here, in October 2021, asserting claims against the United States for false imprisonment and intentional infliction of emotional distress under the Federal Tort Claims Act. The district court denied the government's motion to dismiss for lack of jurisdiction under Fed. R. Civ. P. 12(b)(1) based on sovereign immunity. The government challenges that decision in this appeal.

However, the district court granted the government's motion to dismiss Mengert's IIED claim under Fed. R. Civ. P. 12(b)(6). The parties proceeded to discovery, and the deadline for amending the complaint was December 26, 2022. On March 30, 2023, plaintiff moved to amend her complaint, and the court denied that motion. Finally, the district court granted the government's motion for summary

5

judgment on Mengert's sole remaining claim for false imprisonment. Mengert

challenges all three of these decisions on appeal.

### III. DISCUSSION

1. **The United States waived its sovereign immunity for Mengert's intentional tort claims against TSOs, and therefore there is federal jurisdiction over this suit.**

The Federal Tort Claims Act waives sovereign immunity for tort claims against

the United States based on damages caused by government employees acting within the

scope of their employment. See 28 U.S.C. § 1346(b)(1). Congress created exceptions to

this waiver, including 28 U.S.C. § 2680(h), which reinstates sovereign immunity for

"[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious

prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference

with contract rights." However, § 2680(h)'s proviso (the "law enforcement proviso")

creates an exception to § 2680(h)'s exception—in other words, it re-waives sovereign

immunity under certain circumstances:

> *Provided*, That, with regard to acts or omissions of investigative or law
> enforcement officers of the United States Government, the provisions of this
> chapter and section 1346(b) of this title shall apply to any claim arising, on or after
> the date of the enactment of this proviso, out of assault, battery, false
> imprisonment, false arrest, abuse of process, or malicious prosecution. For the
> purpose of this subsection, "investigative or law enforcement officer" means any
> officer of the United States who is empowered by law to execute searches, to seize
> evidence, or to make arrests for violations of Federal law.

6

28 U.S.C. § 2680(h).

Here, Mengert's claims "aris[e] out of" her alleged false arrest by TSOs, and therefore the government has sovereign immunity under § 2680(h) unless the law enforcement proviso applies.[2]  The applicability of the proviso turns on whether TSOs are "investigative or law enforcement officers of the United States Government."  28 U.S.C. § 2680(h).  The law enforcement proviso defines that term: "'investigative or law enforcement officer' means any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law."  Id. We conclude that TSOs fall within this definition.  Therefore, the law enforcement proviso applies here, and the government does not have sovereign immunity for Mengert's claims against it.

### a.  Legal Standard

This court reviews de novo whether the United States has waived sovereign immunity.  Fent v. Okla. Water Res. Bd., 235 F.3d 553, 556 (10th Cir. 2000).  "The United States and its officers enjoy immunity from suit except in instances where the United States has expressly waived that protection."  Flute v. United States, 808 F.3d 1234, 1239 (10th Cir. 2015).  This court "will find the government has waived sovereign immunity only when its consent to be sued is 'unequivocally expressed.'" Id. (quoting United States v. Nordic Vill. Inc., 503 U.S. 30, 33 (1992)).  Ordinarily,

---

[2] As explained below, Mengert brought a false imprisonment claim, but her claim is more properly characterized as a false arrest claim.  That distinction does not affect our jurisdictional analysis under the FTCA, as § 2680(h)'s first sentence and law enforcement proviso apply to both false imprisonment and false arrest claims.

"statutory text purporting to waive governmental immunity is strictly construed 'in favor of the sovereign.'" Id. (quoting Nordic Vill., 503 U.S. at 34).

However, the Supreme Court has explained that, when interpreting exceptions to the FTCA's waiver of sovereign immunity, the general rule requiring strict construction in favor of immunity does not apply:

> [I]t should be noted that this case [involving claims under the FTCA against the U.S. Postal Service] does not implicate the general rule that "a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign," Lane v. Peña, 518 U.S. 187, 192 [] (1996). As Kosak[ v. United States] explains, this principle is "unhelpful" in the FTCA context, where "unduly generous interpretations of the exceptions run the risk of defeating the central purpose of the statute," 465 U.S. [848,] 853 n.9 [(1984)], . . . which "waives the Government's immunity from suit in sweeping language," United States v. Yellow Cab Co., 340 U.S. 543, 547 [] (1951); see also United States v. Nordic Vill[.], Inc., 503 U.S. 30, 34 [] (1992) (observing "[w]e have on occasion narrowly construed exceptions to waivers of sovereign immunity where that was consistent with Congress' clear intent, as in the context of the 'sweeping language' of the [FTCA]" (quoting Yellow Cab Co., supra, at 547)).

Dolan v. U.S. Postal Serv., 546 U.S. 481, 491-92 (2006). "[T]he proper objective of a court attempting to construe one of the subsections of 28 U.S.C. § 2680 is to identify 'those circumstances which are within the words and reason of the exception'—no less and no more." Kosak, 465 U.S. at 853 n.9 (citation omitted).

As explained above, this case involves 28 U.S.C. § 2680(h)'s law enforcement proviso. The first sentence of § 2680(h) creates an exception to § 1346(b)(1)'s waiver of sovereign immunity, but the law enforcement proviso re-waives sovereign immunity under certain circumstances—in other words, the law enforcement proviso is an exception to an exception to the FTCA's waiver of sovereign immunity.

8

The government argues that, since the law enforcement proviso is a further waiver of sovereign immunity (i.e., an exception to an exception), rather than an exception to the FTCA's waiver of sovereign immunity, Dolan does not apply here. Instead, the government argues, the general rule for interpreting waivers of sovereign immunity should apply—strict construction in favor of immunity. It is true that Dolan involved an exception to the FTCA's waiver of sovereign immunity, rather than an exception to an exception. See Dolan, 546 U.S. at 483; 28 U.S.C. § 2680(b) (reinstating sovereign immunity for "[a]ny claim arising out of the loss, miscarriage, or negligent transmission of letters or postal matter"). However, we see no reason to limit the principles of Dolan when interpreting the law enforcement proviso, especially given the Court's explicit warning in Dolan that the general rule requiring strict construction in favor of immunity is "'unhelpful'" when interpreting the FTCA, which "'waives the Government's immunity from suit in sweeping language.'" Dolan, 546 U.S. at 491-92 (citations omitted). We also note that, while one circuit has agreed with the government's argument that Dolan is inapplicable when interpreting an exception to an exception in the FTCA, at least two other circuits have rejected that argument. Compare Foster v. United States, 522 F.3d 1071, 1079 (9th Cir. 2008) (holding that, in interpreting an exception to an exception to the FTCA's waiver of sovereign immunity, "we ultimately must apply the general rule that waivers of sovereign immunity are construed in favor of the sovereign"), with Iverson v. United States, 973 F.3d 843, 854 (8th Cir. 2020) ("Whether analyzing an exception or an exception to the exception, we are within the FTCA context, and therefore the rule

9

[requiring strict construction in favor of immunity] does not apply."), and Pellegrino v. U.S. Transp. Sec. Admin., 937 F.3d 164, 171-72 (3d Cir. 2019) (en banc) (case interpreting 28 U.S.C. § 2680(h)'s law enforcement proviso, explaining that the general rule requiring strict construction in favor of immunity did not apply, despite an argument to the contrary by the dissent).

Ultimately, then, our task in this appeal is simply to "identify 'those circumstances which are within the words and reason of [§ 2680(h)]'—no less and no more." Kosak, 465 U.S. at 853 n.9 (citation omitted).

### b. Analysis

We are not the first court to address the question at issue in this appeal— whether TSOs are "investigative or law enforcement officers" as defined by § 2680(h). Four other circuits have held that TSOs are "investigative or law enforcement officers" and therefore are covered by the law enforcement proviso. Pellegrino, 937 F.3d at 180 (3d Cir.) (majority in an en banc decision holding, over a dissenting opinion, that TSOs are "investigative or law enforcement officers"); Iverson, 973 F.3d at 854-55 (8th Cir.) (majority for a divided panel holding the same); Osmon v. United States, 66 F.4th 144, 148 (4th Cir. 2023) (unanimous panel holding the same); Leuthauser v. United States, 71 F.4th 1189, 1199 (9th Cir. 2023) (unanimous panel holding the same). The Eleventh Circuit is the only circuit that has reached the opposite conclusion, but it did so in an unpublished, non-precedential decision. Corbett v. Transp. Sec. Admin., 568 F. App'x 690, 701-02 (11th Cir. 2014)

10

(per curiam) (unpublished).[3]  Most of the government's arguments have been considered and rejected by the other circuits to have addressed this issue, and we refer to those courts' decisions throughout our analysis.

### i. TSOs are "officer[s] of the United States"

The law enforcement proviso applies to "any officer of the United States."  28 U.S.C. § 2680(h).  Therefore, we must first determine whether TSOs are "officer[s] of the United States.

The term "officer" is not defined by the statute, and therefore we must give the term its "ordinary meaning."  Rocky Mountain Wild v. Dallas, 98 F.4th 1263, 1291 (10th Cir. 2024).  "Dictionary definitions are useful touchstones to determine the 'ordinary meaning' of an undefined statutory term."  Id. (quoting In re Mallo, 774 F.3d 1313, 1321 (10th Cir. 2014)).  The proviso was enacted in 1974.  Dictionaries from that time defined "officer" as: "one charged with a duty" or "one who is appointed or elected to serve in a position of trust, authority, or command esp. as specif. provided for by law," (Officer, Webster's Third New International Dictionary (1971)); and "[o]ne who is charged by a superior power (and particularly by government) with the power and duty of exercising certain functions" or "[o]ne who is invested with some

---

[3] The Eleventh Circuit in Corbett held that the law enforcement proviso does not cover TSOs because they are "employees," not "officers."  Corbett, 568 F. App'x at 701(11th Cir.).  As explained above, no other circuit to address the issue has agreed with that holding.  Additionally, the plaintiff in Corbett proceeded pro se, and the case was decided without oral argument.  Id. at 692.

11

portion of the functions of the government to be exercised for the public benefit," (Officer, Black's Law Dictionary (4th ed. rev. 1968)).

Applying these definitions to TSOs in Pellegrino, Iverson, and Leuthauser, the Third, Eighth, and Ninth Circuits, respectively, concluded that TSOs are "officer[s] of the United States" under § 2680(h). We agree. TSOs are "charged by a superior power"—Congress—"with the power and duty of exercising certain functions"—conducting airport screenings. See 49 U.S.C. § 44901(a). TSOs' screenings are "functions of the government . . . exercised for the public benefit"—they "protect[] passenger safety and national security" by ensuring "that no passenger enters a plane with a prohibited item, including 'weapons, explosives, and incendiaries.'" Iverson, 973 F.3d at 848 (8th Cir.) (quoting 49 C.F.R. § 1540.5 (defining "Screening function")). And TSOs "serve in a position of . . . authority"—they are held out to the public by the TSA as "officers" based on both their title and their badge. Pellegrino, 937 F.3d at 170 (3d Cir.).

The government notes that Congress chose to use the word "officer" in the law enforcement proviso, rather than "employee," which is used in other subsections of § 2680. See, e.g., 28 U.S.C. § 2680(e) (referring to "claim[s] arising out of an act or omission of any employee of the Government . . ."). The government argues that this distinction should be given significance. We agree—the two terms have distinct meanings. However, as explained above, TSOs fall squarely within the ordinary meaning of "officer" and therefore qualify as "officer[s] of the United States" under § 2680(h).

12

The government cites provisions of the Aviation and Transportation Security Act (ATSA), which creates within the TSA the position of "law enforcement officer" and authorizes such officers to carry firearms, make warrantless arrests, and seek and execute warrants. 49 U.S.C. § 114(p)(1), (2). In contrast, the ATSA classifies TSOs as "Federal Government employee[s]." Id. § 44901(a). We agree with the Third, Eighth, and Ninth Circuits that the ATSA's classification of TSA "law enforcement officers" and TSOs is not dispositive of whether TSOs are "officer[s] of the United States" under the law enforcement proviso.[4] See Pellegrino, 937 F.3d at 171 (3d Cir.) ("Aside from the single shared word 'officer,' there is no textual indication that only a specialized 'law enforcement officer' in the [ATSA], 49 U.S.C. § 114(p), qualifies as an 'officer of the United States' under the proviso in the [FTCA]."); Iverson, 973 F.3d at 849 (8th Cir.) (reaching the same conclusion because: 1. While "Congress described TSOs as employees in the ATSA, . . . it also defined employees in [the] ATSA to include officers. See 49 U.S.C. § 44901(a) (cross-referencing 5 U.S.C. § 2105 (defining employee as 'an officer and an individual')). Consequently, it appears that Congress did not intend to exclude officers when using the term employee to describe screening personnel." (emphasis in original); and 2. TSOs fall under the ordinary meaning of "officers" and are therefore covered under the FTCA's law enforcement proviso, passed

---

[4] The government did not clearly raise this argument, but only hinted at it. (Aplee. Br. 7) (citing the ATSA's definition of TSA "law enforcement officers"); (Aplee. Br. 35-36) (citing the same provisions to distinguish between TSA "law enforcement officers" and TSOs). Nevertheless, we address it here because it is addressed in Judge Krause's dissent in Pellegrino. See Pellegrino, 937 F.3d at 190-92 (3d Cir.) (Krause, J., dissenting).

13

in 1974. Altering that definition based on the ATSA "would require us to hold that Congress silently altered a term's meaning in one statute by passing an unrelated statute almost 30 years later"); Leuthauser, 71 F.4th at 1196 (9th Cir.) (conducting similar analysis and reaching same conclusion).[5]

### ii. TSOs are "empowered by law to execute searches . . . for violations of Federal law"

Having concluded that TSOs are "officer[s] of the United States," we must next consider whether they are "empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." 28 U.S.C. § 2680(h). We conclude that they are.

As a starting point, because "execute searches," "seize evidence," and "make arrests" are listed in the disjunctive, an officer need only be empowered by law to do one of those acts for the law enforcement proviso to apply. See Pellegrino, 937 F.3d at 175 (3d Cir.) ("Each of the three duties independently suffices to define 'investigative or law enforcement officer.'"); Osmon, 66 F.4th at 148 (4th Cir.). Therefore, the government's argument that TSOs are not authorized to carry weapons, seize evidence, or make arrests does not affect our analysis so long as they are empowered by law to "execute searches." See (Aplee. Br. 36).

---

[5] Similarly, we disagree with the government's argument that the TSA's decision to exclude TSOs from its definition of "Law Enforcement Officer" in its administrative Management Directives means that TSOs are not "officers" under § 2680(h). See Transp. Sec. Admin., Management Directive No. 1100.88-1, Law Enforcement Position Standards and Hiring Requirements (May 7, 2007) (providing definition of "law enforcement officer" that excludes TSOs).

First, TSOs are "empowered by law" to conduct "the screening of all passengers and property." 49 U.S.C. § 44901(a). See Pellegrino, 937 F.3d at 172 (3d Cir.) (holding TSOs are "empowered by law" to conduct screenings); Iverson, 973 F.3d at 851 (8th Cir.) (same).

Second, when TSOs conduct screenings, they "execute searches." The very reason for the screening is to search for dangerous and prohibited items and to prevent such items from being brought onto an airplane. Congress defined "screening" in the ATSA as "a physical examination or non-intrusive methods of assessing whether cargo poses a threat to transportation security. Methods of screening include x-ray systems, explosives detection systems, explosives trace detection, explosives detection canine teams certified by the Transportation Security Administration, or a physical search together with manifest verification." 49 U.S.C. § 44901(g)(4). These listed methods are undeniably methods of a search. Additionally, federal regulations require aircraft operators to "refuse to transport" "[a]ny individual who does not consent to a search or inspection of his or her person" by TSOs. 49 C.F.R. § 1544.201(c)(1). We agree with the Fourth Circuit that, "[a]s a matter of 'plain language,' that would seem to be the end of the matter"—TSOs "execute searches." Osmon, 66 F.4th at 148 (4th Cir.) (citation omitted).

We also agree with the Third Circuit that dictionary definitions and Supreme Court case law support the proposition that TSOs "execute searches" when they conduct screenings—whether "search" is considered by its ordinary meaning or as a term of art in the Fourth Amendment context. Pellegrino, 937 F.3d at 172-73 (3d

15

Cir.).  See Search, Webster's Third New International Dictionary (1971) ("to examine (a person) thoroughly to check on whatever articles are carried or concealed"); Search, Black's Law Dictionary (4th ed. rev. 1968) ("[a]n examination of a man's house . . . or of his person, with a view to the discovery of contraband or illicit or stolen property"); Nat'l Treasury Emps. Union v. Von Raab, 489 U.S. 656, 675 n.3 (1989) (referring to "the Federal Government's practice of requiring the search of all passengers seeking to board commercial airliners, as well as the search of their carry-on luggage, without any basis for suspecting any particular passenger of an untoward motive," and explaining that "the lower courts that have considered the question have consistently [applied precedents dealing with administrative searches and] concluded that such searches are reasonable under the Fourth Amendment"); Terry v. Ohio, 392 U.S. 1, 16 (1968) ("[I]t is nothing less than sheer torture of the English language to suggest that a careful exploration of the outer surfaces of a person's clothing all over his or her body in an attempt to find weapons is not a 'search.'").

Resisting this conclusion, the government argues that when Congress referred to "investigative or law enforcement officers" who "execute searches" in the law enforcement proviso, it meant only "officers who 'conduct investigations relevant to criminal law enforcement.'"  (Aplee. Br. 28) (quoting Iverson, 973 F.3d at 862 (8th Cir.) (Gruender, J., dissenting)).  Before addressing each of the government's arguments in support of its proposed interpretation, we first note that the government's interpretation is fatally flawed, as succinctly explained by the Fourth Circuit:

The problem with the government's argument is that it reprises a tactic the Supreme Court has already rejected: "read[ing] into the text additional limitations designed to narrow the scope of the law enforcement proviso." Millbrook[ v. United States], 569 U.S. [50,] 55 [(2013)].  The word "criminal" appears nowhere in the law enforcement proviso—let alone as a modifier of "searches."  See 28 U.S.C. § 2680(h).  Here, as elsewhere, we "may not narrow a provision's reach by inserting words Congress chose to omit."  Lomax v. Ortiz-Marquez, [] 140 S. Ct. 1721, 1725 [] (2020).

Osmon, 66 F.4th at 148-49 (4th Cir.).

Many of the government's arguments in support of its interpretation can be rejected for this reason.  For example, the government argues that the phrase "investigative or law enforcement officer" "naturally evokes criminal law enforcement." (Aplee. Br. 27) (quoting Pellegrino, 937 F.3d at 188 (3d Cir.) (Krause, J., dissenting)). Additionally, the government argues that the meaning of "investigative or law enforcement officer" in the law enforcement proviso must be informed by the meaning of that term in other statutes which define the term as officers authorized to perform traditional criminal law enforcement functions.  (Aplee. Br. 27-28) (citing the Wiretap Act, 18 U.S.C. § 2510(7), and the Foreign Intelligence Surveillance Act, 50 U.S.C. § 1809(b)).[6]

---

[6] Each of those statutes provides its own definition which is materially distinguishable from the law enforcement proviso's definition here.  For example, "investigative or law enforcement officer" is defined in the Wiretap Act as "any officer of the United States or of a State or political subdivision thereof, who is empowered by law to conduct investigations of or to make arrests for offenses enumerated in this chapter, and any attorney authorized by law to prosecute or participate in the prosecution of such offenses."  18 U.S.C. § 2510(7).

17

The government also argues that the torts covered by the proviso—assault, battery, false imprisonment, false arrest, abuse of process, and malicious prosecution—are "'the types of tort claims typically asserted against' officers with" criminal enforcement powers.  (Aplee. Br. 31) (quoting Pellegrino, 937 F.3d at 188 (3d Cir.) (Krause, J., dissenting)).  However, if Congress intended to limit the law enforcement proviso to criminal law enforcement, it could have added one word— "criminal"—rather than relying on implications from less direct language, context-specific definitions from unrelated statutes, and the law enforcement proviso's inclusion of certain torts and exclusion of others.[7]

The government argues that under the canon of *noscitur a sociis*, which generally instructs that words in a list should be given a related meaning, the meaning of "execute searches" in the law enforcement proviso must be informed by the other terms in the list—"seize evidence" and "make arrests."  See In re McDaniel, 973 F.3d 1083, 1097 (10th Cir. 2020) (defining *noscitur a sociis*).  And, the government argues, since "seiz[ing] evidence" and "mak[ing] arrests" are traditional law enforcement functions, the phrase "execute searches" refers only to traditional law enforcement searches—not the type of search conducted by TSOs.  Like the other circuits to address this argument, we reject it for two reasons: 1. The term "searches" is clear, and therefore resort to the canon is unwarranted, see Russell Motor Car Co. v. United

_____

[7] We note that TSOs' task of screening passengers and their cargo—which often involves close, physical interactions—could very feasibly lead to the types of tort claims enumerated in the law enforcement proviso.  This proposition is evinced by Mengert's false imprisonment claim in this case.

States, 261 U.S. 514, 520 (1923) ("'Noscitur a sociis' is a well-established and useful rule of construction, where words are of obscure or doubtful meaning, and then, but only then, its aid may be sought to remove the obscurity or doubt by reference to the associated words." (emphasis added)); and 2. "Execute searches" is listed in the disjunctive with "seize evidence" and "make arrests," and therefore this canon is less helpful, see Pellegrino, 937 F.3d at 174-75 (3d Cir.).

The government next argues that the use of the word "execute" before "searches" indicates that the law enforcement proviso applies only to officers who conduct searches in the criminal context. The government cites the Pellegrino dissent for the proposition that "'every other statute in the United States Code that uses [the phrase 'execute searches'] refers to investigatory searches' and so too does 'every Supreme Court and circuit case that had been published before the proviso was enacted.'" (Aplee. Br. 32) (quoting Pellegrino, 937 F.3d at 185 (3d Cir.) (Krause, J., dissenting)). We reject this argument for the same reason as the Fourth Circuit in Osmon—all of the statutes upon which the Pellegrino dissent relied did not merely refer to executing searches, but instead referred to executing search warrants. Osmon, 66 F.4th at 149 (4th Cir.); see, e.g., 18 U.S.C. § 2231(a) (referring to "any person authorized to serve or execute search warrants"). If Congress wanted to limit the term "execute searches" in the law enforcement proviso to only criminal searches or searches pursuant to a warrant, it could have done so.

The government's remaining arguments are premised on the fact that TSOs' screenings are administrative searches, rather than traditional law enforcement

19

searches for violations of criminal law based on individualized suspicion. See Von Raab, 489 U.S. at 675 n.3 (explaining that TSOs search passengers and their cargo "without any basis for suspecting any particular passenger of an untoward motive" and that lower courts have considered such searches under the Supreme Court's "precedents dealing with administrative searches"); United States v. Aukai, 497 F.3d 955, 960 (9th Cir. 2007) (TSOs' searches serve "'an administrative purpose, namely, to prevent carrying of weapons or explosives aboard aircraft, and thereby to prevent hijackings'" (citation omitted)). The government argues that if the law enforcement proviso is construed to apply to TSOs, then there is "no textual basis for distinguishing the many other federal employees who perform only administrative searches." (Aplee. Br. 40). And, the government argues, this indicates that our interpretation is flawed, as both legislative history and out-of-circuit case law demonstrate that the law enforcement proviso does not apply to officers who are empowered to conduct only administrative searches. See Federal Tort Claims Amendments: Hearings Before the Subcomm. on Claims and Governmental Rels. of the H. Comm. on the Judiciary, 93d Cong. 18 (1974) (statement of Irving Jaffe, Acting Assistant Attorney General) ("We have Department of Agriculture investigators who go into [sic] look at books and records. We have Defense Department auditors to look at books and records. . . . They are not law enforcement officers even under this definition. They don't qualify."). See also Wilson v. United States, 959 F.2d 12, 15-16 (2d Cir. 1992) (per curiam) (holding federal parole officers are not "investigative or law enforcement officer[s]" under 28 U.S.C.

20

§ 2680(h)); EEOC v. First Nat'l Bank of Jackson, 614 F.2d 1004, 1007-08 (5th Cir. 1980) (same for agents of the Equal Employment Opportunity Commission (EEOC)); Solomon v. United States, 559 F.2d 309, 310 (5th Cir. 1977) (same for security guards at an Air Force base exchange); cf. Bunch v. United States, 880 F.3d 938, 945-46 (7th Cir. 2018) (concluding that a forensic chemist for the Bureau of Alcohol, Tobacco, and Firearms (ATF) was an "investigative or law enforcement officer" on the record before the court because his job included "the identification of relevant evidence for colleagues during crime-scene investigations").

We are unpersuaded. We first note that we are only addressing the application of the law enforcement proviso to TSOs—this appeal does not require us to address the law enforcement proviso as applied to other categories of federal officers and employees, and we decline to do so. Also, the brief excerpts of legislative history cited by the government do not affect our analysis. When interpreting statutory text, if "the statute's language is plain, the sole function of the courts . . . is to enforce it according to its terms," and that is what we have done here. Dodd v. United States, 545 U.S. 353, 359 (2005) (citation omitted); Pellegrino, 937 F.3d at 179 (3d Cir.) (declining to consider legislative history because the law enforcement proviso is "'clear on its face'" (citation omitted)).

We also find that some of the out-of-circuit cases cited by the government are distinguishable. In Wilson, the Second Circuit only addressed whether parole officers were empowered by law to "make arrests" or "seize evidence"—the court at no point addressed whether parole officers could "execute searches," which is the act

at issue here.  Wilson, 959 F.2d at 15-16 (2d Cir.).  And in Bunch, the Seventh

Circuit explained that the ATF forensic chemist at issue was an "investigative or law

enforcement officer" because he was empowered to "identif[y] . . . relevant evidence

for colleagues during crime-scene investigations," whereas "there are many

employees of ATF for whom the same cannot be said."  Bunch, 880 F.3d at 945-46

(7th Cir.).  But the court did not indicate, as the government suggests here, that an

officer must be empowered to conduct searches in the criminal context for the law

enforcement proviso to apply.  In fact, the court construed "searches" broadly,

explaining that the proviso "does not require [the officer] to have had authority to

seek and execute search warrants; it speaks only of executing searches, and many

searches do not require warrants."  Id. at 945 (emphasis in original). [8]  Ultimately,

---

[8] In Solomon, the Fifth Circuit concluded that security guards at an Air Force base exchange are not "investigative or law enforcement officers" under 28 U.S.C. § 2680(h) because they are not "empowered by law to execute searches, to seize evidence, or to make arrests for violations of federal law."  Solomon, 559 F.2d at 310 (5th Cir.).  That was the extent of the court's analysis—it did not provide a description of the security guards' duties or otherwise explain why the law enforcement proviso did not apply.  Therefore, Solomon provides little guidance here.

Finally, in EEOC v. First National Bank of Jackson, the Fifth Circuit held that EEOC agents are not "investigative or law enforcement officers" under § 2680(h), even though they are "given the power to: 'at all reasonable times have access to, for the purpose of examination, and the right to copy any evidence of any person being investigated or proceeded against that relates to unlawful employment practices.'" 614 F.2d 1004, 1007–08 (5th Cir. 1980).  We are unpersuaded by that decision for several reasons.  Primarily, it focuses on the authority of EEOC agents to evaluate existing evidence unlike the TSOs who are authorized to conduct proactive screening. Second, the court in that case did not explain the basis for its conclusion that EEOC agents are not empowered by law to execute searches, but instead merely stated that they "are not . . . given the authority to execute searches, seize evidence, or make arrests for violations of federal law" without further explanation.  Id. at 1008.

22

none of the government's arguments have persuaded us to abandon our interpretation based on the ordinary meaning of "execute searches."

Finally, TSOs search "for violations of federal law."  As an initial matter, other circuits that have interpreted the law enforcement proviso have expressed skepticism regarding whether "for violations of federal law" modifies each term in the list—including "execute searches"—and have instead suggested that it modifies only the last term—"make arrests."  See Pellegrino, 937 F.3d at 177 (3d Cir.) (describing the "rule of the last antecedent," which provides, "[w]hen interpreting a statute that includes 'a list of terms or phrases followed by a limiting clause,' that clause 'should ordinarily be read as modifying only the noun or phrase that it immediately follows.'" (quoting Lockhart v. United States, 577 U.S. 347, 351 (2016) (citations omitted))); Osmon, 66 F.4th at 149 (4th Cir.) (applying the same principle); Leuthauser, 71 F.4th at 1197 (9th Cir.) (same).  The government argues, however, that "for violations of federal law" is a "postpositive modifier" that should "'appl[y] to the entire series.'"  (Aplee. Br. 31) (quoting Alpern v. Ferebee, 949 F.3d 546, 550 (10th Cir. 2020)).

We need not address the tension between the government's argument and the decisions of other circuits because even if we assume that the law enforcement proviso applies only if TSOs are empowered to "execute searches . . . for violations

Finally, we are less persuaded by that single, out-of-circuit decision addressing EEOC agents than the four out-of-circuit decisions discussed above addressing the exact question at issue in this case and holding that TSOs are "investigative or law enforcement officers."

of federal law," TSOs satisfy that requirement.  For example, federal law lists various "hazardous materials" that are "forbidden in transportation," and it is the role of TSOs to search passengers and their cargo for such materials.  49 C.F.R. § 172.101(a).  While flying with the "hazardous materials" listed in § 172.101 might not constitute a violation of federal <u>criminal</u> law, Congress did not require criminal violations in the law enforcement proviso's text—it instead required only that officers be empowered to search "for violations of federal law."  See <u>Pellegrino</u>, 937 F.3d at 177 (3d Cir.).  Even if Congress meant "for violations of federal <u>criminal</u> law," federal law makes it a crime to attempt to board an aircraft with a "concealed dangerous weapon" or "an explosive or incendiary device."  49 U.S.C. § 46505(b)(1), (3).  TSOs search for such items.  49 C.F.R. § 1540.5 (defining "[s]creening location" as a "site at which individuals or property are inspected for the presence of weapons, explosives, or incendiaries").

### c.  Conclusion

In sum, TSOs are "investigative or law enforcement officers" as that term is defined in 28 U.S.C. § 2680(h)—they are "officers" who are "empowered by law to execute searches . . . for violations of federal law."  Therefore, the United States has waived sovereign immunity for Mengert's claims "arising . . . out of" her alleged false arrest by TSOs.  We now turn to Mengert's challenges to the district court's decisions on the merits of her claims.[9]

---

[9] In considering the merits of Mengert's claims, we apply the substantive law of the forum state—Oklahoma.  <u>Hill v. SmithKline Beecham Corp.</u>, 393 F.3d 1111,

**2. The district court did not err in granting the government's motion to dismiss Mengert's intentional infliction of emotional distress claim.**

**a. Legal Standard**

The district court granted the government's motion to dismiss Mengert's intentional infliction of emotional distress (IIED) claim under Fed. R. Civ. P. 12(b)(6). "We review de novo the dismissal of a complaint under Rule 12(b)(6)." Clinton v. Sec. Benefit Life Ins. Co., 63 F.4th 1264, 1274 (10th Cir. 2023).

"Dismissal under Rule 12(b)(6) is appropriate only if the complaint, viewed in the light most favorable to plaintiff, lacks enough facts to state a claim to relief that is plausible on its face." Abdi v. Wray, 942 F.3d 1019, 1025 (10th Cir. 2019) (quoting United States ex rel. Reed v. KeyPoint Gov't Sols., 923 F.3d 729, 764 (10th Cir. 2019)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). While "detailed factual allegations" are not required, the complaint "must give just enough factual detail to provide 'fair notice of what the . . . claim is and the grounds upon which it rests.'" Warnick v. Cooley, 895 F.3d 746, 751 (10th Cir. 2018) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.

---

1117 (10th Cir. 2004) ("State substantive law applies to suits brought against the United States under the FTCA.").

Under Oklahoma law, the elements of an IIED claim are:

(1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe.

Comput. Publ'ns, Inc. v. Welton, 49 P.3d 732, 735 (Okla. 2002).  The district court concluded that Mengert failed to state a claim based on the fourth element.[10]

"It is for the court to determine, in the first instance, whether . . . severe emotional distress can be found."  Durham v. McDonald's Rests. of Okla., Inc., 256 P.3d 64, 68 (Okla. 2011).  The Supreme Court of Oklahoma has explained that IIED "is governed by the narrow standards of the Restatement (Second) of Torts § 46." Comput. Publ'ns, 49 P.3d at 735; see also Daemi v. Church's Fried Chicken, Inc., 931 F.2d 1379, 1387 (10th Cir. 1991) ("In large measure, the Oklahoma courts have adopted the approach of the Restatement (Second) on Torts § 46(1) (1965).").  Comment (j) to that section provides an explanation of when alleged emotional distress may be sufficiently severe to support an IIED claim:

> Complete emotional tranquillity is seldom attainable in this world, and some degree of transient and trivial emotional distress is a part of the price of living among people.  The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it.  The intensity and the duration of the distress are factors to be considered in determining its severity.

---

[10] The government's motion to dismiss challenged the claim based on both the second and fourth elements, but the district court assumed, without deciding, that Mengert's complaint alleged conduct that was "extreme and outrageous," as required for the second element.  Therefore, the only basis for the district court's decision was the fourth element.  Since we affirm the district court on that basis, we do not address whether the TSA conduct was extreme and outrageous.

Restatement (Second) of Torts § 46 cmt. j; see also Durham, 256 P.3d at 68 (emotional distress must "go beyond mere hurt feelings, insult, indignity, and annoyance" to the point where it "could be reasonably regarded to constitute emotional distress so severe that no reasonable person could be expected to endure it."). Also, comment (k) explains that "[n]ormally, severe emotional distress is accompanied" by some form of illness or bodily harm, but recovery for IIED is not "limited to cases where there has been bodily harm; . . . if the conduct is sufficiently extreme and outrageous there may be liability for the emotional distress alone, without such harm." Id. § 46 cmt. k.

We briefly describe, as illustrative examples, three cases applying Oklahoma law to determine whether the plaintiffs' emotional distress was sufficiently severe. First, in Durham, the Oklahoma Supreme Court found sufficient evidence of severe emotional distress to allow the plaintiff's IIED claim to proceed to trial when the sixteen-year-old plaintiff's manager refused his request to take anti-seizure medication, responded to his concerns about seizures by calling him a "f. . .ing retard," and, as a result of this treatment, plaintiff: "became depressed and introverted" and "wouldn't go outside, slept all day and had to be homeschooled." Durham, 256 P.3d at 68 (Okla. 2011). Second, in Daemi, this court applied Oklahoma law to an IIED claim brought by a plaintiff who alleged that his employer called him derogatory names based on his national origin, forced him to terminate subordinates because of their national origin, accused him of criminal acts, and subjected him to verbally abusive treatment at seminars. Daemi, 931 F.2d at 1388.

27

This court affirmed the district court's finding after a bench trial that the plaintiff failed to establish sufficiently severe emotional distress when the plaintiff presented evidence that the employer's conduct caused him stomach sickness—to the point that he visited a doctor seeking treatment for his stomach—and caused him to be "insecure, very nervous, and unrestful." Id. (cleaned up). Finally, in Zeran v. Diamond Broad., Inc., this court again considered an IIED claim under Oklahoma law. 203 F.3d 714, 721 (10th Cir. 2000).[11] The plaintiff in Zeran put on evidence that the defendant's conduct caused him anxiety which led him to visit his family physician, who prescribed anxiety medication. Id. at 718. This court concluded that the plaintiff's emotional distress "was not sufficiently severe" and affirmed summary judgment for the defendant, explaining:

> [W]e are not influenced by the fact that Plaintiff did not seek professional treatment and did not discuss his distress with those closest to him.[12] This Court recognizes that there are differences in the manner in which individuals cope. This Court is more influenced by the lack of evidence showing that the distress interfered with Plaintiff's ability to conduct his daily life affairs.

---

[11] In Zeran, an internet user made an online profile and announced the availability for sale of shirts containing offensive phrases regarding the bombing of the Alfred P. Murrah Federal Building in Oklahoma City. That user posted the plaintiff's business telephone number in association with the account, but the plaintiff had nothing to do with the account. Then, a host for an Oklahoma City radio station owned by the defendant discussed the offensive posts and read the plaintiff's number on air. The plaintiff received angry calls and death threats. Zeran, 203 F.3d at 717-18.

[12] By stating that the plaintiff did not seek professional treatment, the court seems to have meant that the plaintiff did not seek specialized treatment for his mental health condition, such as from a psychiatrist or psychologist. The plaintiff in Zeran did see his family physician. Zeran, 203 F.3d at 718.

Id. at 721.

Based on the above passages from the Restatement and this case law, we find that factors for determining whether emotional distress is sufficiently severe include: whether the plaintiff experienced physical symptoms as a result of the distress; whether the plaintiff sought medical attention for either physical symptoms or the emotional distress itself; and whether the distress caused a disruption to the plaintiff's daily affairs.

**b. Analysis**

The district court concluded that Mengert failed to make factual allegations establishing sufficiently severe emotional distress because, based on the allegations in the complaint, her "levels of emotional distress are not so severe as to cause her to discontinue traveling by plane several times per month, and they are not so extreme such that she is unable to do her job that requires frequent plane travel." (Aplt. App. at 116). We agree with Mengert's argument on appeal that Oklahoma law does not require a plaintiff to be unable to resume their daily activities and/or job to state a claim for IIED, although, as described above, it is a factor to be considered in the analysis. That being said, we ultimately agree with the district court's conclusion that Mengert failed to allege sufficiently severe emotional distress under Oklahoma law.

In her complaint, Mengert alleged that, during her interaction with the TSOs, she experienced "symptoms of a panic attack, including racing heart, shortness of breath, uncontrollable shaking, and nausea." (Aplt. App. 12 ¶ 40). Mengert also

29

alleged that, after the incident, she experienced: recurrent, distressing memories of the incident; symptoms of a panic attack when thinking about the incident, including the symptoms listed above and "fear of loss of control of her body, sweating, tightness in throat, headache, and hot flashes, followed by emotional numbness"; and severe shaking when reminded of the incident, "such that she cannot control the movement of her arms and that the trembling of her legs requires her to sit to avoid falling." (Id. at 12 ¶¶ 42-44). She alleged that these symptoms are so unpleasant that she avoids thinking about the incident or discussing it with others.

While the allegations make clear that Mengert has experienced emotional distress as a result of her experience at Tulsa International Airport, our review of the case law above leads us to conclude that her distress, as alleged, is not sufficiently severe to sustain an IIED claim under Oklahoma law. For example, while Mengert alleged that her distress has caused physical symptoms, such as headaches, hot flashes, and uncontrollable shaking when thinking about the incident, there is no indication that she sought any form of treatment for these symptoms or the distress itself. In contrast, in Daemi, the plaintiff's distress led him to seek medical treatment for stomach sickness, and this court still found the plaintiff's distress insufficiently severe. Daemi, 931 F.2d at 1388. And while we made it clear in Zeran that a plaintiff need not seek professional treatment to sustain an IIED claim, we emphasized a different factor that is also not present in Mengert's case—disruption of the plaintiff's daily affairs. Zeran, 203 F.3d at 721. The Oklahoma Supreme Court's decision in Durham—finding sufficiently severe distress when the plaintiff

30

stopped going outside, slept all day, and needed to be homeschooled—confirms the

significance of this factor.  Durham, 256 P.3d at 68.  While not dispositive, we find it

significant that Mengert has continued to travel by plane on a regular basis, despite

the symptoms she experiences when reminded of the incident.

In sum, guided by this case law, we conclude that Mengert has failed to allege

"emotional distress so severe that no reasonable person could be expected to endure

it."  Id.  For this reason, the district court did not err in granting the government's

motion to dismiss Mengert's IIED claim under Fed. R. Civ. P. 12(b)(6).

### 3. The district court did not err in granting summary judgment on Mengert's false arrest claim.

#### a.  Legal Standard

The district court granted the government's motion for summary judgment on

Mengert's false arrest claim.[13]  "We review summary judgment decisions de novo,

applying the same legal standard as the district court."  Sanders v. Sw. Bell Tel., L.P.,

544 F.3d 1101, 1104 (10th Cir. 2008).  Summary judgment is only appropriate "if the

movant shows that there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The burden of

---

[13] As an initial matter, Mengert brought the claim as a false imprisonment claim.  However, under Oklahoma law, false imprisonment can only be brought against private actors.  Delong v. State ex rel. Okla. Dep't of Pub. Safety, 956 P.2d 937, 938 (Okla. Civ. App. 1988).  Therefore, Mengert's claim against the government based on the actions of TSOs is more properly framed as a false arrest claim, and the district court chose to analyze it that way.  See id.  We do the same here, referring to this claim as one for false arrest.

31

showing that no genuine issue of material fact exists is borne by the moving party."

Adamson v. Multi Cmty. Diversified Servs., Inc., 514 F.3d 1136, 1145 (10th Cir.

2008) (citation omitted).  "In considering a motion for summary judgment, this court

draws all reasonable inferences in favor of the nonmoving party."  Id. (citation

omitted).  "If no genuine issue of material fact is in dispute, this court then

determines whether the substantive law was correctly applied by the district court."

Id. (citing Kaul v. Stephan, 83 F.3d 1208, 1212 (10th Cir.1996)).

Under Oklahoma law, an actor has committed a false arrest when he or she

commits an "unlawful restraint of an individual's personal liberty or freedom of

locomotion."  Roberts v. Goodner's Wholesale Foods, Inc., 50 P.3d 1149, 1151

(Okla. Civ. App. 2002) (quoting Black's Law Dictionary (5th ed. 1979)).  Here, the

district court concluded that, "[v]iewing the facts in a light most favorable to

[Mengert], there is no way to view the actual detention or confinement of plaintiff as

unlawful."  (Aplt. App. at 238).  The district court reasoned that the TSA has broad

authority to conduct suspicionless searches at airports, so long as those searches are

not prolonged beyond the time-period necessary to complete their lawful mission,

and the search of Mengert was not unreasonably long—the encounter lasted about

seven minutes.

This was an accurate statement of the law—even suspicionless searches at

airports by TSOs are generally lawful.  Congress has instructed the TSA by statute to

"provide for the screening of all passengers and property, including United States mail,

cargo, carry-on and checked baggage, and other articles, that will be carried aboard a

passenger aircraft." 49 U.S.C. § 44901(a). "The Supreme Court has instructed that the suspicionless screenings conducted at airport security checkpoints pursuant to this statute fall under the administrative search exception to the Fourth Amendment's warrant requirement." Corbett, 568 F. App'x at 696 (11th Cir.) (citing, e.g., Chandler v. Miller, 520 U.S. 305, 323 (1997)).

TSA's authority to search passengers includes the authority to seize passengers to conduct such searches. See United States v. Herzbrun, 723 F.2d 773, 776 (11th Cir. 1984) ("[T]hose presenting themselves at a security checkpoint thereby consent automatically to a search, and may not revoke that consent if the authorities elect to conduct a search."); Corbett, 568 F. App'x at 698 (11th Cir.) (affirming dismissal of claim challenging plaintiff's detention by TSA because once plaintiff entered security checkpoint, he consented to screening process and could be prevented from leaving the checkpoint). However, "a seizure may become 'unlawful if it is prolonged beyond the time reasonably required to complete [its lawful] mission.'" Corbett, 568 F. App'x at 698 (11th Cir.) (quoting Illinois v. Caballes, 543 U.S. 405, 407 (2005)).

**b. Analysis**

Mengert argues that, while the TSOs did have the lawful authority to detain her initially and to continue the search for the suspicious object that showed up in her initial screening, they exceeded the scope of that authority when they told her to lower her pants in front of them so that they could inspect her feminine hygiene product. The district court's conclusion that the stop remained lawful was based on the fact that the mission of the stop was the inspection of the object that showed up in

33

the scan and time spent to obtain that object from Mengert was indispensable to accomplish that legitimate objection. Mengert concedes the lawfulness of this mission. (Aplt. Br. 14) (explaining that the TSOs' "direction" to Mengert to accompany them to a private room for further inspection of the feminine hygiene product is "not challenged here"); (id. at 14-15) ("[T]here is no challenge here to TSA's policy that if its screeners cannot determine that a feminine hygiene product is only that via pat-down, they may direct the traveler to remove the item for inspection."). However, Mengert argues that, while the TSOs could lawfully pursue an inspection of the feminine hygiene product, it was unlawful to do so by conducting a "strip search."[14] Therefore, Mengert argues, the "strip search" converted the lawful detention into an unlawful one by prolonging the search. (Aplt. Br. 16) (arguing that when the TSOs told Mengert to lower her pants, they "completely stopped all progress on their lawful mission so that they could unlawfully search Mengert").

We reject Mengert's argument. As explained above, false arrest under Oklahoma law turns on whether the plaintiff was subjected to an unlawful restraint— not whether conduct during a legally justified restraint was unlawful. And Mengert

---

[14] The government disputes whether the search of Mengert could be classified as a "strip search," as the TSOs offered Mengert a privacy drape that she chose not to use, and there is no allegation that the TSOs touched Mengert during the encounter. Mengert offers competing evidence suggesting that the TSA agents watched her from the front and behind, and that use of the privacy drape was not possible. We need not resolve this issue because regardless of whether the encounter is characterized as a "strip search," Mengert's false arrest claim lacks merit.

concedes that inspection of the feminine hygiene product was a lawful mission.  The

district court's factual findings indicate that the "entire encounter"—meaning from

the time TSO Morroney conducted a pat-down until the time Mengert was cleared

and allowed to leave the private screening room—lasted seven minutes.  Mengert was

in the private screening room for less than three minutes.  Given these facts, we agree

with the district court that TSOs Morroney and Brown did not prolong the stop

"'beyond the time reasonably required to complete [its lawful] mission'"—here,

identifying the product identified near Mengert's groin.  Corbett, 568 F. App'x at 698

(11th Cir.) (citation omitted).  Therefore, the TSOs' brief detention of Mengert was

lawful.[15]

Ultimately, it appears that Mengert's claim seeks to challenge the manner of

detention and the TSOs' conduct, not whether the detention was legally justified.[16]

However, false arrest under Oklahoma law is concerned only with the latter inquiry.

See, e.g., Gouskos v. Griffith, 122 F. App'x 965, 970 (10th Cir. 2005) (unpublished)

_____

[15] Much of the briefing before the district court focused on whether Mengert was actually confined by the TSOs.  The district court did not decide this issue but instead merely assumed that Mengert was confined, and the parties' arguments on appeal focus on the lawfulness of the detention—not whether there was even a detention in the first place.  Because we conclude that the TSOs' "detention" of Mengert was lawful, we need not consider whether Mengert was actually confined.

[16] In fact, Mengert's motion for leave to amend seems to be based on an acknowledgement that other torts, such as battery, assault, and negligence, would have been better vehicles for recovery based on the allegedly unlawful "strip search." (Aplt. App. 118-19) (moving for leave to amend to add claims for battery, assault, and negligence because "the government [] indicated to Plaintiff that it intend[ed] to move for summary judgment" on the false arrest claim on the ground that "an unlawful strip search" did not "meet[] the elements of false imprisonment").

("The common-law tort of false arrest has a single element in Oklahoma: that the defendant-officer arrested the plaintiff without probable cause."); id. at 970, 974 (the plaintiff brought both a false arrest and excessive force claim, and a finding of probable cause would defeat the false arrest claim, but would not preclude the excessive force claim).  We therefore conclude that the district court did not err in granting summary judgment for the government on Mengert's false arrest claim.

### 4. The district court did not abuse its discretion in denying Mengert's motion for leave to amend.

#### a. Legal Standard and the District Court's Decision

The district court denied Mengert's motion under Fed. R. Civ. P. 15(a) for leave to amend her complaint to add battery, assault, and negligence claims.  We review the district court's decision on a motion for leave to amend the complaint for abuse of discretion.  Bylin v. Billings, 568 F.3d 1224, 1229 (10th Cir. 2009).  The district court abuses its discretion when it "commits an error of law," "makes clearly erroneous factual findings," or reaches "an arbitrary, capricious, whimsical, or manifestly unreasonable judgment."  Att'y Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 775-76 (10th Cir. 2009) (citations omitted).

"Federal Rule of Civil Procedure 15(a) provides that, after a responsive pleading has been served, a party may amend its pleading 'only by leave of court or by written consent of the adverse party.'  The Rule specifies that 'leave shall be freely given when justice so requires.'"  Minter v. Prime Equip. Co., 451 F.3d 1196, 1204 (10th Cir. 2006).  However, we have held that "parties seeking to amend their

36

complaints after a scheduling order deadline must establish good cause for doing so."
Gorsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Ass'n, 771 F.3d 1230, 1241 (10th Cir.
2014). The "denial of leave to amend is appropriate 'when the party filing the
motion has no adequate explanation for the delay.'" Minter, 451 F.3d at 1206
(citations omitted); Fed. Ins. Co. v. Gates Learjet Corp., 823 F.2d 383, 387 (10th Cir.
1987) ("Courts have denied leave to amend in situations where the moving party
cannot demonstrate excusable neglect. For example, courts have denied leave to
amend where the moving party was aware of the facts on which the amendment was
based for some time prior to the filing of the motion to amend."). In contrast, the
"good cause requirement may be satisfied . . . if a plaintiff learns new information
through discovery or if the underlying law has changed." Gorsuch, Ltd., 771 F.3d at
1240.

### b. Analysis

Mengert argues that the district court abused its discretion by denying her
motion for leave to amend because: the government waited until summary
judgment—after the December 2022 deadline for amendments to the complaint—to
argue that Mengert's false arrest claim should fail, thus establishing "good cause" for
Mengert's delay in filing her motion for leave to amend; Mengert was only made
aware that a negligence claim could be viable during discovery, when one of the
TSOs admitted that she was not paying attention during the encounter; Mengert could
assert her new claims without adding any new facts, and therefore the government

would not be prejudiced by the late assertion of claims[17]; there was time remaining in discovery; it would have been Mengert's first amendment to the complaint; granting the motion would have caused little-to-no delay in the case; and, generally, failing to allow Mengert to amend to add potentially meritorious claims would result in substantial injustice. We do not find these arguments persuasive.

Mengert argues that she established "good cause" for the delay in filing her motion for leave to amend because "the government advanced a novel legal theory late in the case." (Aplt. Reply. Br. 24) ("The government could have argued that [Mengert's] allegations do not satisfy the elements of false imprisonment in a motion to dismiss in response to the complaint. They instead first raised the issue in a motion for summary judgment."). It is unclear why the government's argument that Mengert failed to establish the elements of false imprisonment (or false arrest) was an unexpected defense. Additionally, the government was not required to assert that defense in a motion to dismiss, rather than wait, as it did, to raise the argument at summary judgment. See Fed. R. Civ. P. 12(h)(2) (the defense of "[f]ailure to state a

---

[17] The district court concluded that Mengert's argument that the amendment would not require the assertion of new factual allegations contradicted her argument that the amendment was based on new evidence. On appeal, Mengert disputes this point—she argues that discovery led her to believe that a negligence claim was viable, and she could add the negligence claim without including new factual allegations. We need not further address this point because, on appeal, Mengert relies on the government's decision to first assert its defense to the false arrest claim at summary judgment to establish "good cause." And that argument does not establish good cause. See (Aplt. Reply. Br. 24).

claim upon which relief can be granted" is not waived by failing to raise it in an answer or motion to dismiss and can be raised through trial).

Therefore, we agree with the district court that Mengert has failed to establish "good cause" for the delay in filing her motion for leave amend until after the December 2022 filing deadline had passed, as required by our precedent. Gorsuch, Ltd., 771 F.3d at 1241. The district court's denial of that motion was not an abuse of discretion. See Minter, 451 F.3d at 1206 ("Courts will properly deny a motion to amend when it appears that the plaintiff is using Rule 15 to make the complaint 'a moving target'" or "'salvage a lost case by untimely suggestion of new theories of recovery'" (citations omitted)).

## IV. CONCLUSION

We conclude that TSOs are "investigative or law enforcement officers" under 28 U.S.C. § 2680(h)'s law enforcement proviso, and therefore the United States waived its sovereign immunity for Mengert's claims challenging the TSOs' conduct. However, Mengert's claims fail on the merits—the IIED claim was properly dismissed because Mengert failed to allege sufficiently severe emotional distress, and the district court properly granted summary judgment for the government on the false arrest claim because Mengert's claim challenges the TSO's conduct during her detention, not the lawfulness of the detention itself. Finally, Mengert has failed to establish "good cause" for her untimely motion for leave to amend the complaint, and the district court did not abuse its discretion in denying that motion. Therefore, we AFFIRM.

23-5100, *Mengert v. United States*

**TYMKOVICH**, Circuit Judge, dissenting in part.

Ms. Mengert went through a body scanner at a TSA PreCheck security checkpoint and then submitted to a pat-down. The screener felt a feminine hygiene product, and, after completing a test for explosive trace residue, informed Ms. Mengert she must go to a private room to be cleared. Two female screeners escorted her to the room and told her to lower her pants and underwear down to her knees. She objected, and the screeners told her compliance was required. Ms. Mengert complied and removed the product for their inspection.

Ms. Mengert subsequently sued the United States pursuant to the Federal Tort Claims Act (FTCA) for false imprisonment and intentional infliction of emotional distress. Although the United States has baseline sovereign immunity from suit, Congress has waived immunity for certain torts through the FTCA. But there are exceptions to this waiver of immunity. Congress retained sovereign immunity for claims arising "out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights[.]" 28 U.S.C. § 2680(h). This exception is known as the "intentional tort exception." *Millbrook v. United States*, 569 U.S. 50, 52 (2013).

But as the Majority explains, an exception exists to this exception—or a "re-waive[er]"—for certain intentional torts. *Pellegrino v. United States of Am. Transportation Sec. Admin., Div. of Dep't of Homeland Sec.*, 937 F.3d 164, 176 (3d Cir. 2019) ("Congress chose to *re-waive* sovereign immunity only for certain torts.")

(emphasis added). "Known as the 'law enforcement proviso,' this provision extends the waiver of sovereign immunity to claims for [] intentional torts . . . based on the acts or omissions of investigative or law enforcement officers." *Millbrook*, 569 U.S. at 52–53 (citations omitted). An "investigative or law enforcement officer[]" is defined as "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." § 2680(h).

The question presented for our interpretive purposes is whether TSA screeners are investigative or law enforcement officers. I disagree with the majority's conclusion that they are. The phrase "execute searches," as limited by the whole of the statutory text, refers to traditional police powers. And because the more plausible reading of the statute limits the scope of the law enforcement proviso, controlling case law instructs us to read it narrowly.

There is a "general rule that a *waiver* of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign." *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 491–92 (2006). In *Dolan*, the Supreme Court found the general rule did not apply: "[T]his principle is unhelpful in the FTCA context, where unduly generous interpretations of the *exceptions* run the risk of defeating the central purpose of the statute . . . which waives the Government's immunity from suit in sweeping language." *Id.* (citations omitted) (emphasis added).

But in *FAA v. Cooper*, 566 U.S. 284, 290–91 (2012), the Supreme Court doubled down on the rule that any ambiguities in a waiver of sovereign immunity are construed in favor of the government:

> We have said on many occasions that *a waiver* of sovereign immunity must be unequivocally expressed in statutory text. . . . . Any ambiguities in the statutory language are to be construed in favor of immunity . . . so that the Government's *consent to be sued is never enlarged beyond what a fair reading of the text requires . . . .* Ambiguity exists if there is a plausible interpretation of the statute that would not authorize money damages against the Government. . . . What we thus require is that the scope of Congress' waiver be clearly discernable from the statutory text in light of traditional interpretive tools. If it is not, then we take the interpretation most favorable to the Government.

*Id.* (emphasis added).

Because the law enforcement proviso is a *waiver* of sovereign immunity, the waiver must be "unequivocally expressed in statutory text" and "any ambiguities in the statutory language are to be construed in favor of immunity." *Cooper*, 566 U.S. at 290-91. *See also United States v. Sherwood*, 312 U.S. 584, 590 (1941) ("The section must be interpreted in the light of its function in giving consent of the Government to be sued, which consent, since it is a relinquishment of a sovereign immunity, must be strictly interpreted."); *Flute v. United States*, 808 F.3d 1234, 1239 (10th Cir. 2015) ("[W]e will find the government has waived sovereign immunity only when its consent to be sued is unequivocally expressed."); *F.T.C. v. Kuykendall*, 466 F.3d 1149, 1154 (10th Cir. 2006) ("[W]aivers of sovereign immunity cannot be implied but must be unequivocally expressed . . . and that any such waiver must be strictly construed in favor of the United States.") (citations omitted). Thus, if the textual basis for the exception is equivocal, we should defer to sovereign immunity.

3

The Eighth Circuit in *Iverson* rejected this narrow view on waivers and exceptions: "the Court's language in *Dolan* is broad; it does direct application of strict construction in the FTCA context. . . . Whether analyzing an exception or an exception to the exception, we are within the FTCA context, and therefore the [general] rule does not apply." 973 F.3d 843, 854 (8th Cir. 2020). But Iverson and the Majority overread *Dolan*—the language is not so broad. The Supreme Court instructs us to resolve any ambiguity in a *waiver* of sovereign immunity in favor of the government, and to ignore this general rule when interpreting *exceptions* to a waiver in the FTCA context. And the law enforcement proviso is certainly a waiver of sovereign immunity. *Pellegrino*, 937 F.3d at 176 ("Congress chose to re-waive sovereign immunity only for certain torts."). "Known as the 'law enforcement proviso,' this provision extends *the waiver* of sovereign immunity to claims for [] intentional torts . . . based on the acts or omissions of investigative or law enforcement officers." *Millbrook*, 569 U.S. at 52–53 (citations omitted) (emphasis added).

We now turn to the government's interpretation. The government asks us to limit the meaning of "execute searches" by the meanings of "seize evidence" and "make arrests." In FTCA cases, like most cases, the Supreme Court explains that "[t]he definition of words in isolation . . . is not necessarily controlling in statutory construction." *Dolan*, 546 U.S. at 486 (interpreting the FTCA's retention of sovereign immunity for claims "arising out of the loss, miscarriage, or negligent transmission of letters or postal matter.") (citing 28 U.S.C. § 2680(b)). "A word in a statute may or may not extend to the outer limits of its definitional possibilities. Interpretation of a word or

phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis." *Id*. This interpretive canon *noscitur a sociis*, instructs that "a word is known by the company it keeps." *Dubin v. United States*, 599 U.S. 110, 124 (2023) (quoting *McDonnell v. United States*, 579 U.S. 550, 568–569 (2016)).

Other circuits have declined to apply this canon in TSA cases. For instance, the Third and Eighth Circuits declined to apply the canon because the phrase "execute searches" was clear and the three duties were listed in the disjunctive. *See Iverson*, 973 F.3d at 852; *Pellegrino* 937 F.3d at 174–75. The Ninth Circuit agreed that the term "searches" was not "of obscure or doubtful meaning" and did not apply the canon. *Leuthauser v. United States*, 71 F.4th 1189, 1199 (9th Cir. 2023) (quoting *Russell Motor Car Co. v. United States*, 261 U.S. 514, 520 (1923)).

Even if the canon did not apply, the plain meaning of "execute searches" has a traditional law enforcement connotation without relying on the surrounding statutory language. *See* Black's Law Dictionary 1518 (4th ed. 1968) (defining "search" as "[a]n examination of a man's . . . person, with a view to the discovery of contraband or illicit or stolen property or some evidence of guilt to be used in the prosecution of a criminal action for some crime or offense.").

Nonetheless, in *Dolan*, the Supreme Court applied the canon to a nearby provision in the FTCA barring claims arising out of the "loss, miscarriage, or negligent transmission of letters or postal matter." 546 U.S. at 485 (quoting 28 U.S.C. § 2680(b)). The Court concluded that the words "loss" and "miscarriage" limit the reach of

5

"negligent transmission." *Id.* at 486. "'[A] word is known by the company it keeps'—a rule that 'is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress.'" *Id.* at 481, 486–87, (2006) (quoting *Jarecki v. G.D. Searle & Co.,* 367 U.S. 303, 307 (1961)). The Supreme Court in *Dolan* did not limit the application of this canon in the same way these other circuits have since limited it.

We must therefore ask how "seize evidence," and "make arrests" color the meaning of "execute searches." To seize evidence and make arrests are traditional police powers. "Mak[ing] arrests . . . no doubt has a criminal color." *Pellegrino*, 937 F.3d at 174. But TSA screeners are not authorized to make arrests or seize evidence. There are two types of TSA employees. First, we have the "law enforcement officer" pursuant to 49 U.S.C. § 114(p)(2). These individuals carry firearms and can make arrests. Then we have the TSA screener—also referred to as "security screening personnel." § 114(e)(2)-(3). And "no TSA screener at [Tulsa International Airport] is authorized to carry a weapon, seize evidence, make arrests, or execute a criminal investigative search." Aple. App. Ex. 1 (Declaration of Federal Security Officer for Oklahoma). Any contraband a TSA screener incidentally discovers during screening is handled by authorized law enforcement personnel with proper badges and certification. *Id.* TSA screeners are therefore not engaged in a traditional law enforcement function.

The meaning of "execute searches" in the law enforcement proviso is therefore limited to investigatory searches for a similar purpose and does not include the administrative searches conducted by TSA screeners. *See City of Los Angeles, Calif. v.*

6

*Patel*, 576 U.S. 409, 420 (2015) (distinguishing an administrative search—conducted to ensure compliance and deter criminals—from searches conducted for the purpose of conducting a criminal investigation). "Administrative searches are ubiquitous and include regulatory searches, . . . administrative subpoenas, . . . inventory searches, , , , workplace drug testing, . . . and border checkpoints." *Pellegrino*, 937 F.3d at 184 (Krause, J., dissenting) (citations and quotations omitted).

To conclude otherwise presents a possible constitutional issue. If TSA screeners are executing searches for "violations of federal law," then the screeners' searches must be based on some individualized suspicion. But TSA screeners conduct searches without grounds for suspicion of particular individuals. The Supreme Court has referred to TSA screenings as "blanket suspicionless searches calibrated to the risk," *Chandler*, 520 U.S. at 323, and the TSA's authorizing statute makes clear that TSA screeners are to screen only for "cargo [that] poses a threat to transportation security," 49 U.S.C. § 44901(a)(4)). Thus, TSA screeners "do not search, and may not constitutionally search, 'for violations of Federal law.'" *Pellegrino*, 937 F.3d at 187 (Krause, J., dissenting). "[A]s between multiple reasonable interpretations of a statute, we will always prefer one that sustains constitutionality to one that does not under the presumption of constitutional validity." *United States v. Brune*, 767 F.3d 1009, 1023 (10th Cir. 2014).

I would reverse the district court's conclusion that Congress waived sovereign immunity for intentional torts committed by TSA screeners. I otherwise agree with the Majority's analysis of the other issues raised on appeal.